RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0265p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

STEVIE L. ENGLAND,

*Petitioner-Appellant,*

*v.*

DEEDRA HART, Warden,

*Respondent-Appellee.*

No. 18-6039

─────────────────

Appeal from the United States District Court
for the Western District of Kentucky at Paducah.
No. 5:06-cv-00091—Thomas B. Russell, District Judge.

Argued: April 28, 2020

Decided and Filed: August 17, 2020

Before: SILER, MOORE, and NALBANDIAN, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** Chanson Chang, COVINGTON & BURLING LLP, Washington, D.C., for Appellant. Emily Bedelle Lucas, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee. **ON BRIEF:** Chanson Chang, Jeffrey Lerner, COVINGTON & BURLING LLP, Washington, D.C., for Appellant. Emily Bedelle Lucas, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee.

SILER, J., delivered the opinion of the court in which NALBANDIAN, J., joined. MOORE, J. (pp. 22–23), delivered a separate opinion concurring in part.

---

**OPINION**

---

SILER, Circuit Judge.  Stevie L. England, a Kentucky prisoner serving a life sentence, appeals from a district court's judgment denying his petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  We granted a certificate of appealability ("COA") on three issues raised by England.  *See* Fed. R. App. P. 22(b). First, England claims that the trial court erroneously admitted his police confession given that he had invoked his Sixth Amendment right to counsel.  Second, he argues that the trial court's improper admission of hearsay statements from the deceased victim was erroneously deemed harmless error.  Finally, England argues that the prosecution suppressed evidence in violation of *Brady*.  Because the state court did not err in its interpretation or application of federal law, we **AFFIRM** the district court's denial of England's habeas petition.

I.

On July 10, 2000, Lisa Halvorson was found deceased in her driveway.   It was later determined that she had been dead for approximately three days and that the cause of death was asphyxia.  Police immediately began investigating Halvorson's death as a homicide.

Early in the investigation, the focus was on two of Halvorson's romantic partners: Tyrone McCary, her former boyfriend and father of her child, and Pat Halvorson, her former husband.  While the investigation was ongoing, Karl Woodfork came forward after hearing of a $10,000 reward for testimony leading to a conviction.  He alleged that McCary had paid him and England to murder Halvorson and to make it look like an accident.  He claimed that McCary paid them $1,000 each as a down payment, with an understanding that they were to be paid an additional $10,000 each following the completion of the murder.  Woodfork agreed to wear a wire, allowing the police to obtain a secretly recorded conversation between him and England.  In this conversation, England complained about McCary's not having paid him the owed money and made various threats that he would cause physical harm to McCary if he was not paid.

Police subsequently brought England to the station for questioning and informed him that he had been recorded speaking with Woodfork. After the police accused him of participating in the murder plot, England responded: "Well, I mean you know, I guess you'll just have to go on and lock me up then and call my lawyer, cause I don't, I don't know what you're talking about." The interrogation continued, and England ultimately admitted that he was present at the murder scene with McCary, but claimed only to have punched Halvorson in the jaw once to "soften her up," which knocked her to the ground. England stated that he unsuccessfully attempted to talk McCary out of committing further violence. He also claimed that Halvorson was still alive when he and McCary departed the scene.

At trial, the prosecution's theory of the case was that England took part in a plan to make it appear that Halvorson was accidentally run over by her own truck while exiting her garage. "McCary and/or [England]: drove to [Halvorson's] house; knocked her to the ground in or near the garage; beat her severely; accelerated the truck backward out of the garage, causing [Halvorson's] face to be caught in the right bumper and spinning her into the wheel well; got on top of her and broke her windpipe, resulting in death by asphyxia." The jury convicted England of murder and recommended a sentence of life imprisonment without the possibility of parole.

In 2005, the Kentucky Supreme Court affirmed England's conviction and sentence on direct appeal. The following year, England filed a petition for a writ of habeas corpus, alleging twenty-six grounds for relief. In 2017, the magistrate judge recommended dismissal of the petition in its entirety, and in 2018 the district court adopted the magistrate's findings. On appeal, we granted a COA on three issues.

II.

This habeas petition is governed by 28 U.S.C. § 2254(d) ("AEDPA"). It instructs that federal courts shall not grant a habeas petition filed by a state prisoner with respect to any claim adjudicated on the merits by a state court, absent applicability of either of two specific exceptions. The first exception is when a state court issues a judgment "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." 28 U.S.C. § 2254(d)(1); *Williams* v. *Taylor*, 529 U.S. 362, 412 (2000).

The second exception applies when a state court decision "was based on an unreasonable determination of the facts" in light of the record before it.  § 2254(d)(2).

AEDPA's requirements reflect a "'presumption that state courts know and follow the law,'" *Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)), and its "highly deferential standard for evaluating state-court rulings . . . demands that state-court decisions be given the benefit of the doubt," *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Visciotti*, 537 U.S. at 24).  In essence, under § 2254(d), federal habeas review is a safeguard against "extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal."  *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (*quoting Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (2011)).

We review the district court's factual findings for clear error, and its legal conclusions de novo.  *Railey v. Webb*, 540 F.3d 393, 397 (2008).  The state court's factual findings enjoy a presumption of correctness, and will only be disturbed upon clear and convincing evidence to the contrary.  *Id.*

III.

**A.  Fifth Amendment Claim**

England's first claim is that his police station confession should have been suppressed because he had invoked his Fifth Amendment right to counsel prior to making the inculpatory statements.  The Kentucky Supreme Court found that England's statement was not an unambiguous request for attorney, and that in any case, the admission of the police confession was harmless error in light of the other evidence the Commonwealth presented.  Regardless of whether we believe the state court's determination to be correct, it was nevertheless grounded in a reasonable interpretation of clearly established Supreme Court law.  As such, the Kentucky Supreme Court's determination must stand under AEDPA's deferential standard of review. *See* 28 U.S.C. § 2254(d); *Cullen*, 563 U.S. at 181.

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court delineated certain safeguards that must be afforded to criminal suspects.  These safeguards include the right to

consult with an attorney before speaking to law enforcement officials and to have an attorney present during a custodial interrogation. *Id.* at 469-473. These rights must be explained to a suspect before the questioning begins "to insure that the individual knows he is free to exercise the privilege at that point in time." *Id.* at 469. In *Edwards v. Arizona*, the Supreme Court emphasized that "having expressed his desire to deal with the police only through counsel," a suspect must not be "subject to further interrogation by the authorities until counsel has been made available to him." 451 U.S. 477,484-85 (1981). Of particular relevance here, the *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights," *Michigan v. Harvey*, 494 U.S. 344, 350 (1990), and to ensure that officers "will not take advantage of the mounting coercive pressures of 'prolonged police custody.'" *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010) (*quoting Arizona v. Roberson*, 486 F.3d 675, 676 (1988)).

In *Smith v. Illinois*, the Court noted that occasionally "an accused's asserted request for counsel may be ambiguous or equivocal." 469 U.S. 91, 95 (1984). And in *Davis v. United States.*, 512 U.S. 452, 457 (1994), the Court addressed the question of how police should interpret such a statement. The suspect in *Davis* stated "[m]aybe I should talk to a lawyer," and the Court found that such a remark was not an unambiguous request for counsel. *Id.* at 462. The Court refused to adopt a rule that would require police to cease questioning just because "a suspect makes a statement that *might* be a request for an attorney." *Id.* at 461. To do so would eviscerate the "clarity and ease of application" provided by the *Edwards* bright-line rule. *Id.* Recognizing the argument that this rule might lead to harsh results for suspects, the *Davis* Court explained that "the primary protection afforded suspects is the *Miranda* warnings themselves." *Id.* at 460.

The inquiry for reviewing courts is whether the suspect has "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. The inquiry is objective. *Franklin v. Bradshaw*, 545 F.3d 409, 414 (6th. Cir. 2008). The suspect must "make some affirmative 'statement' or 'request' whose ordinary meaning shows his desire to deal with the police through counsel." *United States v. Suarez*, 263 F.3d 468, 483 (6th. Cir. 2001)

(citations omitted); *see also Edwards*, 451 U.S. at 484 (the request must show the suspect's "desire to deal with the police only through counsel").

With *Miranda* and its progeny in mind, we turn to England's arguments. During the police station interrogation, the police officer told England that he knew he was present when Halvorson was killed and that England was paid money to participate in her murder. The officer stated that they had already informed the prosecutor of these allegations, but that "there's room open for some leeway on it." The officer then advised England "if you want to cooperate with us, now is the time, but I, I'm not bluffing. I'm not. I'm telling you the truth. We've got you." England then stated: "Well, I mean you know, I guess you'll just have to go on and lock me up then and call my lawyer, cause I don't, I don't know what you're talking about."

England argues that his response contains two separate declarations: his willingness to cooperate ("I guess you'll just have to go on and lock me up then") coupled with his assertion of his right to counsel ("call my lawyer"). But we cannot simply sever his purported request from the remainder of the sentence in question. Asking us to look at the words "call my lawyer" as a freestanding declaration would distort the facts. Indeed, this clause was preceded by the coordinating conjunction "and," which linked "lock me up then" to "call my lawyer." As such, the words "call my lawyer" did not "follow[] this statement" as England contends—they were part of the very same sentence. This distinction is crucial, as "[h]ad he made . . . [this] simple, unambiguous statement, he would have invoked his right to cut off questioning." *Berghuis v. Thompkins*, 560 U.S. 370, 382, (2010).[1]

Because we will not view "call my lawyer" in isolation, many of the cases England cites are not quite analogous. *See, e.g.*, *Smith*, 469 U.S. at 97 (holding statement "Uh, yeah, I'd like to do that" upon learning of the right to counsel was unambiguous); *Edwards*, 451 U.S. at 479–80 (holding statement "I want an attorney before making a deal" triggered *Miranda* rights); *Moore v. Berghuis*, 700 F.3d 882, 887 (6th Cir. 2012) ("Moore invoked his constitutional right to counsel by requesting that the police officer call his attorney's phone number."). The closest

---

[1]The standards for invoking the Fifth Amendment right to counsel and the right to remain silent are interchangeable because, according to the *Thompkins* Court, there is no principled reason to adopt different standards. 560 U.S. at 381.

comparison that England cites is *Kyger v. Carlton*, 146 F.3d 374, 379 (6th Cir. 1998), in which we found that the defendant invoked his right to counsel by remarking: "I'd just as soon have an attorney [']cause, you know—ya'll say there's been a shooting involved and that's a serious charge." But this phrase is not indicative of sarcasm the way that "I guess you'll just have to go on and lock me up then" is. Although it is "good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney," the police are not obligated to clarify or ask follow-up questions to determine whether the suspect in fact wanted an attorney. *Davis* 512 U.S. at 461. Here, the detectives reminded England that he had the right to "lawyer up," but England nevertheless responded that he would talk and tell what he knew. A reasonable police officer would not take England's statement literally—that he was actually requesting to be locked up. And if a questioning officer is reasonably unsure as to whether the suspect wants a lawyer, to require that questioning immediately stop would impermissibly "transform the *Miranda* safeguards" into "irrational obstacles to legitimate police investigative activity." *Michigan v. Mosley*, 423 U.S. 96, 102 (1975).

*Davis*'s requirement of a clear, unequivocal request has proved to be fatal to claims like England's in our circuit: "I think I should talk to a lawyer, what do you think?" was not unequivocal, *United States v. Delaney*, 443 F. App'x 122, 130 (6th Cir. 2011); nor was the statement "[i]t would be nice to have an attorney," *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994). "I really should have a lawyer, huh?" was also ambiguous. *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017). England attempts to differentiate his statement by noting that his exact words were "call *my* lawyer"—suggesting that he was specifically requesting *his* attorney. True, this court has held that specificity "corroborate[s] the unequivocal nature of that request." *Abela v. Martin*, 380 F.3d 915, 926 (6th Cir. 2004) ("nam[ing] the specific individual with whom he wanted to speak[,] . . . corroborate[d] the unequivocal nature of that request"), *abrogated on other grounds by Guilmette v. Howes*, 624 F.3d 286 (6th Cir. 2010). But England's mere use of the word "my," when the officers had no indication that he was represented by counsel, is far different than giving a specific attorney's name, *Abela*, 380 F.3d at 926; phone number, *see, e.g.*, *Moore*, 700 F.3d at 887; or business card, *Yenawine v. Motley*, 402 F. App'x 997, 998 (6th Cir. 2010) (per curiam). And again, England's argument is hampered by the fact that it was not a standalone statement.

England also claims that the Warden's argument impermissibly uses his post-request statements to challenge the clarity of his purported request. *Smith* instructs that once a suspect clearly invokes his right to counsel, police may not continue to question him and use his answers to cast retrospective doubt on the purported request for counsel. *Smith*, 469 U.S. at 97. That is, we cannot retroactively glean ambiguity in a suspect's statement based on "postrequest responses to further interrogation." *Id.* at 100; *see also Tolliver v. Sheets*, 594 F.3d 900, 922 (6th Cir. 2010) ("[W]e may consider what came before the request, but may not look to [the defendant's] *subsequent* statements to determine whether the initial request was ambiguous.").

But here, at least some of England's post-request statements were not in response to further interrogation. In the same breath as his purported request—and before officers asked him any further questions—England stated "I'll just be honest with you. Like I said, me and Tyrone are friends. I've never seen that woman in my life." Such a statement would indicate to a reasonable officer that England was willing to continue talking to the officers. The situation was far different in *Smith*, where the state challenged the clarity of the suspect's request based solely on his "responses to continued police questioning." 469 U.S. at 97 (emphasis added).

Next, England argues that the state court contradicted the Supreme Court's mandate in *Davis* that a request for counsel need only be "sufficiently clear[] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," 512 U.S. at 459, by stating that his request "[did] not rise to the level of impressing upon the interrogator that the suspect has requested an attorney before continuing the questioning." A state-court adjudication is "contrary to" federal law if it reaches a conclusion of law opposite to that reached by the Supreme Court, or if the state court decides a case with materially indistinguishable facts differently than the Supreme Court. *Goodell v. Williams*, 643 F.3d 490, 495 (6th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06, (2000)). "Clearly established Federal law" refers to Supreme Court holdings at the time of the state court's decision. *Williams*, 529 U.S. at 412.

England's argument is that the court's use of the phrase "impress upon" impermissibly transformed the Supreme Court's objective standard into a subjective one. In the order granting England's COA, we looked to the dictionary's definition of the word "impress": "to produce or

imprint an especially vivid impression of." *England v. Hart*, No. 18-6039, at 5 (6th Cir. Feb. 26, 2019) (order) (quoting *Impress*, Merriam-Webster Unabridged Dictionary, http://unabridged.merriam-webster.com/unabridged/impress (last visited Feb. 21, 2019)). But the Warden points us to the definition of the complete phrase "impress upon," which means "to make someone understand or be familiar with the importance or value of something." Respondent's Br. at 19 (quoting *Impress On/Upon*, Cambridge Dictionary, http://dictionary.cambridge.org/us/dictionary/english/impress-sth-on-upon-sb (last visited December 28, 2019).

In any event, the state court's poor phrasing was not "diametrically different," "opposite in character or nature," or "mutually opposed" from the *Davis* standard, as required to find that the state court misinterpreted federal law. *Williams*, 529 U.S. at 405-06. But the instant case is far different than a court's stating the wrong burden of proof in an ineffective assistance of counsel claim. *Id.* Here, "impress upon" is not so radically different from the court's pronouncement in *Davis* that a suspect must articulate a desire to have counsel "sufficiently clearly" as contemplated by the contrary-to prong.

Nor did the district court err in its interpretation of relevant Supreme Court precedent. England argues that by comparing England's statement to a negotiation tactic, the district court impermissibly speculates about England's subjective mental state. *Davis* instructs that whether a suspect invokes his right to counsel is an "objective inquiry." 512 U.S. 458-59. Here, the district court compared England's statement to that in *Perrault v. Smith*, 874 F.3d 516, 519-20 (6th Cir. 2017), in which the defendant responded to a police officer's accusation that his story was inconsistent by stating "[w]ell, then let's call the lawyer then 'cause I gave what I could." In that case, we expressed approval of the state court's classification of the suspect's statement as a negotiation, likening it to "[t]hat's all I got; take it or leave it." *Id.* at 520. To be sure, we are prohibited from utilizing circuit precedent "to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that [the Supreme Court] has not announced." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013) (per curiam). But the district court's use of *Perrault* is immaterial, as the state court's decision is supported by sufficient federal law without looking to *Perrault*.

The "unreasonable application" prong of 28 U.S.C. § 2254(d)(1) applies when the state court identified the correct legal principle but applied it to the facts of the petitioner's case in an objectively unreasonable way. *Goodell*, 643 F.3d at 495. The Supreme Court has stated that to constitute an unreasonable application, "the state court's ruling . . . [must be] so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Our role is therefore to "determine what arguments or theories supported or . . . could have supported, the state court's decision." *Id.* at 102. We then turn to the question of whether "fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme Court]." *Id.* at 102. We note that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 410. Accordingly, we may not grant a habeas petition based solely on our own "independent judgment that the [state court] applied clearly established federal law erroneously or incorrectly"; "that application must also be unreasonable." *Id.* at 411.

We undertake this "objective[] unreasonable[ness]" inquiry, *id.* at 409, in view of the specificity of the governing rule: "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations," *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Conversely, "[i]f a legal rule is specific, the range may be narrow" and "[a]pplications of the rule may be plainly correct or incorrect." *Id.* Here, the relevant Supreme Court precedent comes from *Davis*, which we have previously held represented a "general rule." *McKinney v. Hoffner*, 830 F.3d 363, 373. Accordingly, the state court is given some latitude in its application of *Davis* to the facts of this case.

England argues that the state court materially changed the meaning of his statement by finding that "[i]n essence, England merely said that I guess you will have to call my lawyer and I don't know if I need my lawyer because I don't want to get into trouble." He directs us to *Smith v. Illinois*, in which the petitioner remarked "[u]h, yeah. I'd like to do that," upon learning that he had a right to consult with an attorney. 469 U.S. at 93. The Supreme Court found such a statement to be unambiguous. But *Smith* is easily distinguishable from the facts before us. First, England sidesteps the fact that his statement was not prefaced solely by the words "I guess."

As discussed previously, it cannot be viewed separate and apart from the remainder of his statement. Second, in *Smith* the Court noted, "with the possible exception of the word 'uh'," there was nothing to reasonably suggest equivocation in the petitioner's statement. *Smith*, 469 US at 97. The same cannot be said for England, whose purported request was buried within a larger statement.

England's reliance on *United States v. Scott*, 693 F.3d 715 (6th Cir. 2012), is similarly unpersuasive. In *Scott*, we held that the defendant had unambiguously invoked his right to counsel by writing "no" in response to the following written question: "Having these rights in mind, do you wish to talk to us now?" *Id.* at 717. We noted, "[i]f there is any ambiguity about Scott's right to counsel, it is in the form itself, and not in his invocation of the right." *Id.* at 720. The same cannot be said for England, as his alleged request was not directly in response to a statement advising him of his *Miranda* rights, nor was it equivalent to the unequivocal "no" used by the defendant in *Scott*.

Nevertheless, England argues that the use of the phrase "I guess" constituted firmer language than the petitioner's "[m]aybe" in *Davis*. Our precedent, and that of other circuits, suggests the opposite conclusion. *See, e.g.*, *United States v. Havlik*, 710 F.3d 818, 822 (8th Cir. 2013) ("I guess you better get me a lawyer then" was not an unambiguous request for counsel); *United States v. Nolan*, 443 F. App'x 259, 260 (9th Cir. 2011) (defendant's mid-interview statement that "I guess I have to, you know, get a lawyer or something because we're not coming to an understanding here" was not an unequivocal request for counsel); *Luna v. Lamarque*, 400 F. App'x 169, 172-73 (9th Cir. 2010) (defendant's statements "I should probably get a lawyer, I guess" and "In other words, I'll just wait 'til I get booked and wait 'til I'm charged or whatever, you know whatever or get a lawyer" did not constitute an unambiguous request for counsel).

Whether we ultimately believe there to be a constitutional difference between the statement made in *Davis* and the statement here is irrelevant. Under AEDPA, our inquiry focuses not on whether the officers *could* have interpreted England's statement as an unambiguous request for an attorney, but whether it was objectively unreasonable for the Kentucky Supreme Court to conclude otherwise. We cannot say that it was. Indeed, the very

fact that many courts have considered this issue and reached differing conclusions—in other words, "fairminded jurists [] disagree[d]," *Yarborough*, 541 U.S. at 664—supports our conclusion that the state court did not unreasonably apply federal law.

Even if we had found that the admission at trial of England's police station confession violated his right to counsel and that the state court unreasonably applied or failed to follow clearly established federal law by admitting it, England would still need to demonstrate that the error was prejudicial to warrant granting his petition. *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015). On habeas review, an error is harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). To meet this standard there must be more than the "reasonable possibility" that the error contributed to the jury's verdict. *Mitzel v. Tate*, 267 F.3d 524, 534 (6th Cir. 2001) (*quoting Brecht*, 507 U.S. at 637). If we harbor "grave doubt" about whether the state court's error had a "substantial and injurious effect or influence in determining the jury's verdict" then the error is not harmless, and the petition must be granted. *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)) (internal quotation marks omitted).

England argues that his confession to police was inextricably woven throughout the Commonwealth's case, tainting the jury's view of other evidence.[2] To be sure, a confession is prejudicial—"the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991) (alteration in original) (quoting *Bruton* v. *United States*, 391 U.S. 123, 139-140) (White, J., dissenting)). But even if the police station confession were suppressed, the Commonwealth had the taped conversation between England and Woodfork—which was entirely independent of the police station confession—to build its case around.[3]

---

[2]England did not confess to murdering Halvorson. Rather, he admitted that he struck her and knocked her to the ground. England maintains that McCary actually killed Halvorson. Nevertheless, the actions England admitted to were sufficient to be found guilty of the crime of conviction—complicity to murder. *See* Kentucky Revised Statutes (KRS) 502.020(1)(b) ("A person is guilty of an offense committed by another person when, with the intention of promoting or facilitating the commission of the offense, he . . . [a]ids, counsels, or attempts to aid such person in planning or committing the offense[.]").

[3]The parties dispute whether the tape of the police interview was played to the jury. The Warden states that it was not played, while England claims that the "entirety of the interrogation, which lasted nearly two hours"

In the Woodfork recording, England makes numerous inculpatory statements. He told Woodfork that he waited in Halvorson's garage, and when he saw her, he "came out like a running forward and pop[,]" he hit her, knocking her out. England stated that he "should have just shot the bitch." He continued to complain about McCary's failure to pay him the promised money, "[y]ou wanted her dead; you're going to pay. . . . I want the . . . money." He compared McCary's actions in the case to his own. "He knows I'm bad. He didn't do anything. He ran the truck around in a circle. . . . I did all the work and didn't get shit. . . . He should know who he's fucking with. He see what I done. He think I won't do that to him?"

To be certain, England is not required to show that but for the error he would have been acquitted. *Kyger*, 146 F.3d at 382. But unlike *Moore*—a case England cites in which the stricken confession left only circumstantial eyewitness evidence—the prosecution had England's inculpatory statements to Woodfork. 700 F.3d at 889. Given this, we cannot conclude that the police station confession—even if we had found it to be erroneously admitted—had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (citation omitted).

**B. Confrontation Clause Violation**

The trial court allowed the Commonwealth to introduce Halvorson's affidavit in support of an emergency protective order ("EPO") against McCary—filed just a month prior to her death—in which she stated that McCary had threatened to kill her or have someone else kill her. The Kentucky Supreme Court found that this affidavit was erroneously admitted in violation of the Confrontation Clause, and neither party disputes this finding before this court. Rather, England disputes the state court's finding that the improper admission constituted harmless error.

The "starting point" for a § 2254 case is to identify the clearly established federal law that governs the habeas petitioner's claims. *Marshall v. Rodgers*, 569 U.S. 58, 61 (2013). In *Crawford v. Washington*, the Supreme Court announced that "[w]here testimonial evidence is at issue, . . . the Sixth Amendment demands what the common law required: unavailability and a

---

was played to the jury at trial, citing the Virtual Record of the trial. "[T]he Commonwealth presented two audio tapes to the jury: in one England confessed to the crime at the police station, and in the other England made inculpatory statements to Woodfork." The record indicates England is correct.

prior opportunity for cross-examination." 541 U.S. 36, 68 (2004). In *Davis v. Washington*, the Court clarified that statements "are testimonial when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution," rather than to enable the assistance of law enforcement to respond to an ongoing emergency. 547 U.S. 813, 822 (2006) (footnote omitted).

The Kentucky Supreme Court made it "abundantly clear that statements made for the purpose of obtaining a restraining order are not admissible at trial." Although the state court failed to cite *Crawford* in its analysis, the district court found that it nevertheless properly reviewed England's claim. Indeed, the state court decision need not refer to relevant Supreme Court cases or even demonstrate an awareness of them. *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam). Rather, it is sufficient that the result and reasoning are consistent with Supreme Court precedent. *Id.* That was the case here: the Kentucky Supreme Court's decision encompassed the Supreme Court's prohibition against admission of a testimonial statement by a non-testifying witness to the deceased Halvorson's testimonial affidavit in support of an EPO.

To grant England's petition, we would need to find that the affidavit's admission was prejudicial to England's case. Confrontation Clause violations are subject to harmless-error analysis. *McCarley v. Kelly*, 801 F.3d 652, 665 (6th Cir. 2015). Depending on the procedural stage of a criminal defendant's conviction challenge, different harmless error tests apply. *O'Neal v. Balcarcel*, 933 F.3d 618, 624 (6th Cir. 2019). On direct appeal in state court, the defendant-friendly harmless error formulation announced in *Chapman v. California*, 386 U.S. 18, 24 (1967), applies—error is harmless only if the court can "declare a belief that [the error] was harmless beyond a reasonable doubt."

However, "the test is different" on collateral review. *Ayala*, 135 S. Ct. at 2197. Determining whether to grant a habeas petition based on a Confrontation Clause challenge requires us to ask whether the error "had [a] substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.**[4]** Building on this standard, in

---

**[4]**Although *Crawford* and *Brecht* spell out different standards for harmless error analysis in habeas petitions under AEDPA, this court has held that "in this Circuit[,] . . . *Brecht* is always the test, and there is no reason to ask both whether the state court 'unreasonably' applied *Chapman* under AEDPA and, further, whether the constitutional

*McAninch*, the Supreme Court instructed federal courts "to ask directly, 'Do I, the judge, think that the error substantially influenced the jury's decision?'" 513 U.S. at 436. "The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *Id.* at 438 (quoting *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). Grave doubt means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 435.

The Kentucky Supreme Court asked only whether there was a "reasonable possibility that absent error the verdict would have been different." It proceeded to apply this standard when analyzing the facts. "If ever there were evidence that . . . failed to satisfy the 'verdict would be different' standard required for reversal, it is here." But for the purposes of habeas review, we assess the prejudicial impact of constitutional trial errors under the "substantial and injurious effect" standard set forth in *Brecht*, examining the error by applying the factors announced in *Delaware v. Van Arsdall* to the facts in the case. 475 U.S. 673 (1986). These include: (1) the importance of the witness's testimony in the prosecution's case; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted, and . . . (5) the overall strength of the prosecution's case. *Id.* at 684. The district court properly considered these factors in finding that the state court's harmless error analysis was reasonable.

*The Importance of the Witness's Testimony in the Prosecution's Case.* England argues that the hearsay statements contained in the affidavit were used to prove McCary's intent to commit murder (a necessary element of the complicity to commit murder charge for which England was convicted). According to England, because the prosecution's theory of the case was that McCary hired England to commit the murder, the affidavit's reference to a third party who could kill Halvorson ("if he didn't do it, he knew someone that could") provided the necessary context for England's involvement. The Warden downplays the potentially damaging

---

error had a 'substantial and injurious' effect on the jury's verdict." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 412 (6th Cir. 2009).

role of the affidavit, arguing that it was only discussed for two minutes of four days of testimony. But this ignores the fact that a highly inflammatory statement could be deeply influential on the jury's verdict no matter how briefly it is mentioned. Nevertheless, we find persuasive the Warden's characterization of the prosecution's use of the affidavit—as merely background information to explain why McCary became the prime suspect in the investigation. Indeed, the affidavit's passing reference to a hypothetical third party did not directly implicate England. More importantly, the affidavit was not absolutely necessary to the prosecution, as it could still put forward England's statements to Woodfork to provide the necessary context for England's involvement.

*Cumulative Evidence.* Next, England argues that the affidavit was corroborative, rather than cumulative, of the aspects of the Woodfork statements that the prosecution relied on. "[E]vidence that is merely cumulative of that already presented does not . . . establish prejudice." *Getsy v. Mitchell,* 495 F.3d 295, 313 (6th Cir. 2007) (en banc) (*quoting Broom v. Mitchell*, 441 F.3d 392, 410 (6th Cir. 2006)). Determining what constitutes cumulative evidence can be difficult, as "[o]ur cases . . . do not tell us clearly when evidence becomes sufficiently different to no longer be 'cumulative' or at what level of generality one must compare the evidence." *Vasquez v. Bradshaw*, 345 F. App'x 104, 120 (6th Cir. 2009). Our most frequent formulation of the standard is that "new evidence" is not cumulative if it "differs both in strength and subject matter from the evidence actually presented at [trial]." *Goodwin v. Johnson*, 632 F.3d 301, 327 (6th Cir. 2011).

The affidavit's inference—that England was the person McCary hired to kill Halvorson—was presented in graphic detail through the Woodfork confession. "He wanted me to do it. Kill her." "He had, he did approach me about paying me." "He offered me a thousand then he told me, first, and then he told me ten thousand, what he said." England also stated that McCary had given him $1,000.00 in a white envelope containing hundred-dollar bills, which was consistent with Woodfork's trial testimony that McCary had handed both him and England white envelopes containing $1000.00 each. And England alluded to the fact that McCary had failed to pay him the full amount: "You wanted her dead; you're going to pay. . . . I want the fucking money."

*Corroborating or Conflicting Evidence.* To show corroboration of the substance of the affidavit (that McCary threatened to kill Halvorson), the Warden points to the testimony of Cori Poindexter—the last person to see Halvorson alive—who claimed to have overheard a conversation in which McCary threatened to "end it" with Halvorson and stated that if he could not have her, no one would. However, England posits that these statements have an innocuous meaning: simply that McCary intended to break up with her or otherwise terminate their relationship. But even without the affidavit, the Woodfork testimony provides sufficient corroboration, as England himself implied that McCary had recruited him to kill Halvorson. Given this additional support, this *Van Arsdall* factor weighs in the Warden's favor.

*Extent of Cross-Examination Otherwise Permitted.* England provides no counter to the Warden's assertion that he could have cross-examined Detective Walker about the affidavit. That he chose not to do so—instead focusing his defense on other elements of the case—does not mean he was deprived of the opportunity.

*Strength of Prosecution's Case.* The final, and most critical factor in harmless error analysis is the overall strength of the prosecution's case. *Perkins v. Herbert*, 596 F.3d 161, 177 (2d Cir. 2010). In *McCarley*, we likened the erroneously admitted testimony at issue "to a keystone holding the arch of the State's case together" which, when removed, caused the State's case to "collapse[] into disjointed pieces." 801 F.3d at 667. We reasoned that the untainted evidence "paint[ed] a clear picture of the crime, but only when considered in light of [the hearsay testimony]." *Id.* That is not the case here. The Warden argues the affidavit was "extraneous and, frankly, unnecessary in light of all the evidence." Indeed, "[t]hough it is impossible to speculate how the trial may have played out under different circumstances," *Jensen v. Romanowski*, 590 F.3d 373, 381 (6th Cir. 2009), the prosecution's case was supported by competent evidence: the police confession, the Woodfork confessions, and the corroborating circumstances found at the crime scene. As such, the affidavit was far from the "linchpin of the government's case, connecting [the defendant] to the fruits of the crime in a way no other evidence, testimonial or physical, could." *Reiner v. Woods*, No. 18-1413, 2020 U.S. App. LEXIS 10838, at *1-2 (6th Cir. Apr. 7, 2020).

Accordingly, we cannot say that we harbor grave doubt as to the effect or influence the affidavit might have had on the jury's verdict. The state court's harmless error determination must stand.

**C. *Brady* Claims**

England's final claim is that the trial court erred by denying England's motion for a new trial despite his showing that the Commonwealth withheld exculpatory forensic evidence. Specifically, this evidence refers to (1) Caucasian head hair found in Halvorson's underwear; (2) Caucasian head hair found in Halvorson's hands; and (3) semen found in Halvorson's vagina, which was determined to belong to her then-boyfriend Shannon Jenkins. Both England and McCary are African-American. England contends that had he been permitted to present this evidence, there was a reasonable probability that he would not have been convicted. Accordingly, he argues the Kentucky Supreme Court unreasonably applied federal law in concluding otherwise. *See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 405.

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Supreme Court has stated that "[t]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82, (1999). The defendant has the burden of proving a *Brady* violation. *See id.* at 291, 296; *see also Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000).

Because significant time elapsed from when England claims he left Halvorson's house and the discovery of her body, he argues that the presence of foreign Caucasian hairs would have supported an argument that another person struck the final blow against Halvorson. Halvorson had a Caucasian boyfriend, Jenkins, at the time of her death and also had a Caucasian ex-husband, Pat Halvorson, who was originally investigated as a suspect in her murder prior to the emergence of Woodfork. Additionally, Pat Halvorson had a life insurance policy on Lisa at the

time of her death, and he had made a statement to police indicating that he and Lisa had separated on bad terms. Accordingly, England theorizes that the evidence at issue would have bolstered an argument that a disgruntled romantic partner committed Halvorson's murder.

Confusion arises from the Kentucky Supreme Court's failure to definitively explain if—or how—the prosecution suppressed evidence. Its vague reasoning includes the following curious statement:

> [England] contends that he was not informed that the sperm found in Lisa's vagina was from her boyfriend, Shannon Jenkins, that there was a Caucasian head hair found in Lisa's panties, and that there were Caucasian head hairs in her hands. However, England was aware of the crucial parts of this information prior to trial. For instance, he was aware that the hair in Lisa's hand was probably from a cat. As to the sperm found, England argued that the sperm taken from Lisa did not match either England or McCary. Also, England was aware that Jenkins stated that he recently had sexual intercourse with Lisa.

England appears to argue that because he was aware of "crucial parts" of the information, there were other parts that he was erroneously not made aware of. But a review of the record belies this claim.

As to the hair found in Halvorson's hand, a trace evidence analyst told the jury that the hair had Caucasian characteristics, and England's trial counsel cross-examined this analyst, and emphasized this finding in his closing argument. The jury was also informed that the hair in Halvorson's underwear was from a Caucasian person.[5]

As to the sperm evidence, England contends that the prosecution's failure to affirmatively identify Jenkins as the sperm contributor was an evidentiary suppression. However, the jury was informed that the sperm DNA was not a match to either England or McCary. Indeed, *Brady* does not require a prosecutor to "deliver his entire file to defense counsel," but only to disclose those items which are material to the defendant's guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 675 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("We have never

---

[5]Another wrinkle to add to the dispute: the Warden argues that the state court erroneously held that England knew prior to trial that the hair in Halvorson's hand was from a cat. Unfortunately, the Supreme Court of Kentucky made the inaccurate observation that England knew it was cat hair prior to trial. The Warden is unable to find where it has been corrected throughout England's appeals. The Warden has relied upon the video record. Confusingly, England apparently argues that he was aware prior to trial that the hair was from a cat.

held that the Constitution demands an open file policy."). But when "evidence is obviously of such substantial value to the defense . . . elementary fairness requires it to be disclosed even without a specific request." *United States v. Agurs*, 427 U.S. 97, 110 (1976). England contends that knowing that the sperm DNA was a match to Jenkins would have allowed him to better focus his defense on a theory that Jenkins was the killer. And to be sure, it is one thing to present an argument, but something entirely different to be provided the evidence to support that argument.

Yet even if we found that evidence was suppressed, England fails to establish that it prejudiced his defense. Prejudice (and materiality) is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682; *see also Cone v. Bell*, 556 U.S. 449, 469 (2009). A reasonable probability is shown "when the . . . suppression undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (1995) (*quoting Bagley*, 473 U.S. at 678). To make this showing, England need only clear the "lower than the more-probable-than-not standard." *LaMar v. Houk*, 798 F.3d 405, 416 (6th Cir. 2015). But "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112 (internal quotation marks and citation omitted). In determining whether a reasonable probability exists, we consider the undisclosed evidence collectively. *See Kyles*, 514 U.S. at 435 (explaining that a *Brady* violation is shown through "favorable evidence [that] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict").

England argues that the presence of Caucasian head hair in Halvorson's hand and underwear would have supported his theory that another individual—perhaps one of the Caucasian suspects—was responsible for her death. At the very least, he argues, it would have allowed the jury to infer that a Caucasian individual was in close contact with Halvorson shortly before her death. While this is "conceivable," it does not present a substantial likelihood of a different result. *Harrington*, 562 U.S. at 112 (internal quotation marks and citation omitted).

Disclosing the source of the sperm found in the victim's vagina would have shown that Jenkins had recently had sexual intercourse with Halvorson. But England provides no support for the contention that a woman's most recent sex partner should automatically be considered a

suspect for her murder—especially when no evidence of sexual assault was found. Moreover, the prejudice inquiry "does not extend to assessments of the impact that the suppression may have had on [Defendants'] subsequent trial strategy." *United States v. Fields*, 763 F.3d 443, 461 (6th Cir. 2014) (quoting *Smith v. Metrish*, 436 F. App'x 554, 564 (6th Cir. 2011)); *see also Joseph v. Coyle*, 469 F.3d 441, 473 n.23 (6th Cir. 2006) ("Rather, we have expressly recognized the Supreme Court's explicit rejection of the argument that 'the [materiality] standard should focus on the impact of the undisclosed evidence on the defendant's ability to prepare for trial.'") (alterations in original) (quoting *Agurs*, 427 U.S. at 112 n.20).

Nevertheless, England directs us to *Mills v. Barnard*, in which we found that—at least at the motion-to-dismiss stage—a petitioner's claim that suppressed DNA evidence in a sexual assault case would have shown conclusively that it was contributed by another individual satisfied the elements of a *Brady* violation. 869 F.3d 473, 485-86 (6th. Cir. 2017). But that case involved a sexual assault in which the defendant was found guilty based solely on the victim's testimony coupled with DNA evidence from her underwear; as such, it is easily distinguishable from the instant case. Here, the medical examiner testified that she found no indication a sexual assault had occurred. And, England's trial counsel did not challenge the medical examiner's conclusion on cross examination. Thus, the identity of the DNA evidence was far from crucial to the Commonwealth's case.

In sum, even if all the evidence were as England wishes, it does not persuade us that there is a reasonable probability the result of the trial would have been different. *Strickler*, 527 U.S. at 281. We therefore cannot conclude that the state court unreasonably applied federal law in rejecting England's *Brady* claims.

**AFFIRMED**.

---

**CONCURRING IN PART**

---

KAREN NELSON MOORE, Circuit Judge, concurring in part. We need not address the potential Fifth Amendment problem in admitting Stevie England's police-interrogation confession, because England made an independent, recorded confession to Karl Woodfork about his involvement in Lisa Halvorson's murder. The critical question is what England said on those recordings. Were his statements as inculpatory as his police-interrogation confession? Based on England's counsel's concession at oral argument that England is heard admitting to violence against Halvorson in the Woodfork recordings, the answer is yes, and the potentially erroneous admission of England's police-interrogation confession was therefore not prejudicial.

Counsel's concession clarifies what is otherwise a confusing trial record. We were unable to review the actual content of the Woodfork recordings, because the recordings are unintelligible in the trial record. The only relevant item we could review was a trial-record video of the prosecutor, during his closing argument, purporting to relay direct quotes from England in these recordings, involving admissions of violent acts against Halvorson. On the one hand, if true, these statements are highly inculpatory. On the other hand, neither the state court, the magistrate judge, nor the district court found that the jury heard England confess to involvement in Lisa's murder in the Woodfork recordings. In fact, the three courts all describe the Woodfork recordings as containing less directly inculpatory content, namely England stating that McCary owes him money and considering ways to get McCary to pay. *See England v. Kentucky*, No. 2003-SC-0328-MR, 2005 WL 1185204, at *5 (Ky. May 19, 2005) ("In those conversations, which were played for the jury, England said McCary had not paid money owed to him and considered ways to coerce McCary to pay him the money."); *England v. Simpson*, No. 506CV00091GNSLLK, 2017 WL 10238035, at *2 (W.D. Ky. Mar. 6, 2017) ("Woodfork agreed to be wired for sound, and authorities obtained secretly-recorded conversations with Petitioner in which Petitioner complained about McCary's not having paid him some owed money (the inference being that it was the $10,000 owed for having assisted McCary commit the murder)."); *id.* at *7 n.11 ("Petitioner told Woodfork that McCary had not paid money owed to him and

considered ways to get McCary to pay."); *England v. White*, No. 5:06-CV-091-TBR-LLK, 2018 WL 4353692, at \*2 (W.D. Ky. Sept. 11, 2018) ("Before the trial, Woodfork agreed to be wired for sound, and the police secretly recorded conversations between Woodfork and England, in which England complained about McCary owing him money.").

We sought clarity on this issue at oral argument, asking counsel for England whether he disputed that his client could be heard, in the Woodfork recordings, admitting to hitting Halvorson and knocking her out, and stating that he should have just shot her. Oral Arg. Audio at 11:25–11:35. Counsel replied, "We don't dispute that those statements were made on the tape with the informant [Karl Woodfork]." *Id.* at 11:48–11:53. Therefore, even excluding the police-interrogation confession, the jury heard England confess, in explicit detail, to his involvement in Lisa Halvorson's murder. Indeed, these statements mirror the most incriminating portion of his police-interrogation confession, in which he stated that he struck Halvorson in the jaw. In light of this separate confession, the admission of England's police-interrogation confession cannot be deemed prejudicial. For this reason, as to the majority's analysis of England's Fifth Amendment claim, I concur only in its conclusion regarding the lack of prejudice to England. I further concur in the remainder of the majority's opinion on the Confrontation Clause and *Brady* claims.