RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 26a0118p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

PHILLIP L. JONES,

                             *Petitioner-Appellant*,

      *v.*

TIM SHOOP, Warden,

                             *Respondent-Appellee*.

No. 24-3356

———————————

Appeal from the United States District Court for the Northern District of Ohio at Akron.
No. 5:19-cv-02063—Solomon Oliver, Jr., District Judge.

Argued: August 21, 2025

Decided and Filed: April 22, 2026

Before: GIBBONS, GRIFFIN, and THAPAR, Circuit Judges.

———————————

## COUNSEL

———————————

**ARGUED:** Joseph E. Wilhelm, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Joseph E. Wilhelm, Matthew Gay, Jillian S. Davis, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cleveland, Ohio, for Appellant. Brenda S. Leikala, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

———————————

## OPINION

———————————

JULIA SMITH GIBBONS, Circuit Judge. Petitioner Phillip L. Jones, an Ohio prisoner sentenced to death, appeals the district court's denial of his petition for writ of habeas corpus.

Jones makes three arguments on appeal: first, that the trial court violated his Confrontation Clause rights by allowing two witnesses to testify to out-of-court statements made by his wife; second, that his trial counsel were ineffective by not presenting testimony from a forensic expert to counter the state's expert during the guilt phase; and third, that his counsel were ineffective during the penalty phase of trial.  For the foregoing reasons, we affirm the judgment of the district court and deny Jones's petition for writ of habeas corpus.

## I.  Factual History

### A.  Pre-Trial Proceedings

Around 6:00 AM on April 23, 2007, Susan Yates's body was discovered at Mount Peace Cemetery in Akron, Ohio.[1]  Yates's skirt and bra were torn, with her bra "ripped at the connecting fabric between the cups and . . . turned around on her torso."  *State v. Jones*, 984 N.E.2d 948, 954 (Ohio 2012).  A small, plastic, glow-in-the-dark cross was placed over her right eye, and her face and neck had many bruises.  Police also located Yates's shoes, a hat, and a pocketknife on the ground near the body.

A day later, Akron police arrested Jones in connection with Yates's death.  When interviewed at the police station that night, Jones stated that all he would "say about this is that it was an accident."  *Id.* at 955.  Soon after, Jones was charged with one count of aggravated murder, one count of murder, and two counts of rape.  Jones pled not guilty to all charges.  On October 22, the grand jury supplemented the indictment against Jones to include a death penalty and repeat offender specification.  Four days later, the court authorized Jones's lawyers to retain Dr. James Siddall, a forensic psychologist, for mitigation purposes.  The court also granted the defense's motion to hire Thomas Hrdy as a defense mitigation expert.  The case then proceeded to trial.

---

[1]Because this case does not turn on factual disputes, we rely at times on the account of the facts from the Ohio Supreme Court decision in Jones's direct appeal and the Ohio Court of Appeals decision from Jones's state post-conviction petition.  *See Mammone v. Jenkins*, 49 F.4th 1026, 1035 (6th Cir. 2022) (relying on the Ohio Supreme Court's decision to supply facts not in dispute).  These factual findings are "presumed to be correct," and Jones has the "burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**B. Trial**

      **i.    The State's Evidence**

Jones's wife, Delores, testified that Jones was not home when she arrived home at around 10:30 PM on April 22.  Upset by Jones's absence, Delores spent the night with her mother.  When Delores returned the next morning, she found Jones sleeping in bed and noticed that he had a scratch on his shoulder and lip.  Delores spent the rest of the day with Jones, and noted that he was "quiet, very quiet," which was "unusual" for him.  DE 19-1, Trial Tr., Page ID 5961.

Around 4:00 PM on April 24, after Jones watched television and read the newspaper, Delores spoke to Jones "about something that was on the news." *Id.* at 5964.  However, because Jones invoked his spousal privilege, Delores could not testify about the details of their conversation.  After that privileged conversation, Delores ran an errand with Jones and then drove herself to the home of her close friend, Charlette Jeffries.

Delores arrived at Jeffries's home between 4:30 PM and 5:00 PM, feeling "[h]ysterical, upset, [and] hyperventilating." *Id.* at 5941–42, 5966.  She was "scared to death." *Id.* at 5966.  Once there, she told Jeffries "what [Jones] had told [her]" and called police, asking "to speak to somebody in charge" because she had information about Yates's case. *Id.* at 5967.  After Detective Richard Morrison arrived to take a statement, Delores shared with him the same information she told Jeffries.

The trial court allowed Jeffries and Morrison to testify about their conversations with Delores under the excited utterance hearsay exception.  Jeffries stated that, at around 4:45 PM, Jones arrived at her home "upset" and "screaming." *Id.* at 5941–43.  Jones immediately told Jeffries "[h]e did it, he did it." *Id.* at 5941.  When Jeffries asked Delores to clarify who did what, Delores stated "[m]y husband, Phil," "[m]urdered the woman," "[t]he woman that they found in the cemetery." *Id.* at 5943–44. Jeffries said that she was not present when Delores later spoke to Morrison at her home.  On cross-examination, Jeffries denied that Delores said Jones described the woman's death as accidental.

Morrison also testified about his conversation with Delores. Morrison noted that Delores "was hyperventilating and basically hysterical." *Id.* at 5894. After she calmed down, Delores told Morrison that her "husband is the one that killed that girl in the cemetery." *Id.* Morrison said that Delores told him that she knew the victim's name was Susan, which Morrison considered important because Yates's name had not been disclosed to the public.

Delores went to the police station for further questioning later that night. While there, Morrison showed Delores the glow-in-the-dark cross found over Yates's eye, which she did not initially recognize. Delores contacted police the next day, however, to explain that Jones had given her a similar glow-in-the-dark cross earlier that year, and that she knew that Jones kept another one in his wallet.

The county's chief deputy medical examiner, George Sterbenz, testified for the state at trial. Sterbenz conducted an autopsy of Yates and concluded that she died from asphyxia by strangulation and that the manner of death was homicide. Sterbenz testified that the autopsy revealed abrasions on the upper chest, collar bones, neck, and jaw line. Yates also had bruising around her right eye and scalp, and smaller abrasions over her arms, leg, feet, and back, which Sterbenz said resulted from "blows" to those areas. *Jones*, 984 N.E.2d at 955; DE 19-1, Trial Tr., Page ID 6107. Moreover, Yates had "'gouging' or 'fingerprint type abrasions'" on her neck, right thumb, and elbow." *Jones*, 984 N.E.2d at 955. There were likewise "[p]etechiae, or 'pinpoint type hemorrhages,'" found "on her face and in her eyes" that Sterbenz concluded was "indicative of strangulation." *Id.*; DE 19-1, Trial Tr., Page ID 6096. Yates's larynx was also fractured in two places.

Sterbenz further concluded that Yates had been sexually assaulted vaginally and anally. Sterbenz testified that Yates had "extensive vaginal injuries." *Jones*, 984 N.E.2d at 955. Yates's anus and rectum also had significant "internal, deep bruising." *Id.* Because of the depth of Yates's bruising, Sterbenz speculated that Yates's injuries could have been caused by a "foreign object" like "a fist," a "very large rigid foreign object," "tools," or a tool handle. DE 19-1, Trial Tr., Page ID 6143–44, 6170–71. He also noted that, during the autopsy, investigators found a twig "in the fecal material inside [Yates's] rectum about four to six inches from the anal opening." *Jones*, 984 N.E.2d at 955.

On cross-examination, Jones asked Sterbenz questions about chain of custody, the state's investigation, and autopsy procedures. Additionally, Jones asked Sterbenz whether he thought Yates may have swallowed and digested the twig that was discovered in her rectum. Sterbenz responded that he did not think that was possible because the twig could not have maintained its integrity through the digestive process. Jones did not present his own expert to rebut Sterbenz's testimony.

DNA evidence also connected Jones to Yates's death. Jones's semen was found on Yates's skirt and on vaginal swabs. No semen was detected, however, on the rectal swabs or on tissue paper found near Yates's body.

The state additionally presented evidence that Jones had pled guilty to two counts of attempted rape in 1990. The victim in that case, who was 16 years old at the time of the assault, testified at Jones's trial. She explained that Jones, a friend of her older sister, had driven her to a secluded area near a park and "put his hands around her neck and started choking her." *Jones*, 984 N.E.2d at 956. After the victim tried to fight back, Jones twice tried to rape her anally and then choked and raped her vaginally. During that period, Jones hit and bruised the victim's back and threatened to kill her several times. And before he left, Jones told the victim that "he would kill her if she told anyone what he had done." *Id.*

### ii.    Jones's Defense

Jones testified on his own behalf. He admitted that he killed Yates but said he did so accidently. According to Jones, he and Yates had a prior relationship that began in February or March 2007. Jones testified that he was driving around 8:45 PM on April 22, the night of Yates's death, when he saw a man attacking a female victim who was defending herself with a knife. Jones pulled over to confront the attacker and, only at this point, recognized Yates as the victim. The man assaulted Jones before fleeing. After Jones and Yates returned to his car, Yates smoked crack cocaine. The pair later bought more crack from a man on the street and alcohol from a nearby market.

Sometime between 9:00 PM and 9:30 PM, Jones and Yates went to Mount Peace Cemetery. Yates smoked three more crack-laced cigarettes. After she was done, Jones and

Yates began making out and had vaginal sex with a condom. Jones testified that they did not have anal intercourse and that he did not do anything to her anal area.

According to Jones, "Yates told him she wanted to have 'rough' sex." *Id.* at 958. She specifically wanted Jones "to put his hands around her throat and restrain her breathing as she neared orgasm." *Id.* But "[a]t some point" after they started having intercourse, he heard "'a crack, cracking sound or popping sound.'" *Id.* After Jones realized Yates was not moving, he stopped and noticed that the condom had broken. He tried CPR—to no avail—and then "panicked because 'he had a rape case.'" *Id.* Jones fled without contacting police. He also denied intentionally killing Yates, stating that he "guess[ed] it . . . went too far," and that he "applied too much pressure" to her throat. DE 19-2, Trial Tr., Page ID 6562.

Jones said that he arrived home between 10:30 PM and 10:45 PM and that Delores was there when he arrived. When asked where he was coming from, Jones "told [Delores] that he had been out and had broken up a fight." *Jones*, 984 N.E.2d at 958.

Jones also denied raping his friend's sister in 1990. Jones said that "he never choked" her and indeed "could not have done so because he has limited mobility in his right arm, which he asserted had been shattered in late 1989 and had led to the surgical removal of the radius bone." *Id.* at 957. He said that their encounter was consensual and that they had previously had sex "'[a]t least several, maybe four times,' before the rape." *Id.*

On cross-examination, Jones could not explain, or explicitly denied, several aspects of the state's evidence. First, Jones stated that he had no explanation for the stick in Yates's rectum and speculated that the injuries to her rectum were "[p]ossibly" from "some other guy, not me." DE 19-2, Trial Tr., Page ID 6657. Second, Jones did not know how a piece of tissue paper ended up in Yates's vagina. Third, Jones could not explain why his broken condom was not found at the scene. Fourth, Jones denied causing any injuries to Yates's face and neck. Fifth, Jones denied leaving the cross found over Yates's eye or seeing the cross that Delores found in her jewelry box. And sixth, on cross-examination, the state presented a life-sized doll and asked Jones to demonstrate how he strangled Yates. Jones did so but "used two hands" (rather than

one as described in his direct testimony) to demonstrate how he choked Yates. *Jones*, 984 N.E.2d at 964.

### iii. The State's Rebuttal

On rebuttal, the state recalled Sterbenz. Sterbenz testified that that "it was physically impossible for Jones to have killed Yates in the manner that he had demonstrated." *Id.* The doctor identified numerous discrepancies that, in his professional opinion, illustrated that Jones's version of events was impossible. We list some highlights here.

First, "Sterbenz explained that Jones's [claimed manner of] placing of his hands on Yates's neck and squeezing would not produce the complex pattern of abrasions that were present on Yates's neck." *Id.* Sterbenz testified that "the severity of the bruising on Yates's neck was not consistent with simply squeezing but rather 'shows a violent act, level of force, [] that is commonly conceived as or interpreted as violent.'" *Id.* at 965. Second, Sterbenz testified that the "'gouging'" or "'fingernail type'" injuries on Yates's neck suggested that she "'grasp[ed] at [her] neck and also claw[ed] to try to move'" and "'remove . . . the strangulation force around her neck.'" *Id.* at 965. Third, although Jones claimed that he applied "steady pressure" with "no other movement" to Yates's neck when they had intercourse, "the autopsy revealed large bruises on the back of the head that indicated that Yates's head had been subjected to a 'pounding action.'" *Id.* at 962, 965. Fourth, Sterbenz found unlikely Jones's story that Yates went "limp and died immediately." *Id.* at 965. According to Sterbenz, "asphyxiation takes quite a number of minutes to occur, and after unconsciousness occurs, the pressure then needs to be maintained until death is accomplished." DE 19-2, Trial Tr., Page ID 6691.

### iv. Penalty Phase

On December 17, 2007, the jury convicted Jones on all charges and specifications. The penalty phase of the trial began on January 10, 2008. Jones called ten mitigating witnesses and made an unsworn statement.

Siddall testified about Jones's background, noting his family's "history of psychiatric, substance-abuse, and criminal-justice problems." *Jones*, 984 N.E.2d at 986. Siddall diagnosed

Jones with a mood disorder that resulted from a "'serious history of depression and mood instability,'" which was "'associated with repeated suicidal behaviors,'" as well as alcohol and cannabis abuse and an antisocial personality disorder. *Id.* at 987. Jones also demonstrated psychotic behavior and reported hallucinations. Siddall further explained:

> Jones has 'a chronic history of mental illness which has required very expansive psychiatric treatment while he was incarcerated and in the community.' Jones has been repeatedly hospitalized and been treated with antidepressants, mood-stabilizing drugs, and antipsychotic medications. Jones was also raised in a family with a long history of psychiatric problems, alcohol and drug abuse, domestic violence, and involvement with the criminal-justice system. [T]hese severe problems affect most members of Jones's family and represent 'a rather unusual cluster of very serious problems in a given family.'

*Id.* at 987–88 (citation modified). Siddall acknowledged, however, that a psychiatrist at Oakwood Forensic Hospital who treated Jones while he was in prison reported that Jones malingered his symptoms and that he admitted he falsely reported hearing voices. But Siddall explained that "malingering in itself does not negate some form of mental disorder." DE 19-2, Mitig. Hr. Tr., Page ID 6996. And Siddall countered the Oakwood psychiatrist's testimony by noting that he did not "recall in the record discussions of malingering around the other psychiatric issues that [Jones] experiences," including "depress[ion], mood swings, . . . [and a] history of drug abuse." *Id.* at 7018. Siddall did concede, however, that the records indicated "a discussion of malingering or exaggeration or distortion around the psychotic symptoms." *Id.* And, based in part on the Oakwood records, Siddall wrote in his mitigation report that "the consensus of professional opinion contained . . . in [Jones's] records suggest[s] that [his] psychotic symptoms were consciously exaggerated." DE 19-2, Mitig. Hr. Tr., Page ID 7005–06, 7215.

Nine other witnesses testified on Jones's behalf, including his mother, Henrietta; Jones's sister, Yolanda White; the mother of Jones's children, Christy Coffe;[2] Jones's two children; the regional administrator of the Akron parole board; and three pastors close to Jones. Henrietta testified that Jones suffered from serious mental health problems from a young age, resulting in

---

[2]Although Coffe testified during the penalty phase as "Christine Harmel," she is referred to by her married name "Coffe" during post-conviction proceedings. DE 19-2, Evid. Hr. Tr., Page ID 7924, 7907.

multiple suicide attempts. This included one attempt at eight years old where he drank gasoline, which required his stomach to be pumped, and another attempt where he tried to hang himself. Yolanda also testified that she remembered, even as a teenager, that Jones reported he was hearing voices. Other witnesses testified to Jones's positive influence as a father and commitment to his Christian faith. Henrietta stated, moreover, that she provided a stable home for her children, provided for their needs, and that Jones had a close relationship with her and her deceased husband, Theodorus.

Jones also issued an unsworn statement. He stated that he had abusive childhood, witnessed domestic violence numerous times, his family abused drugs and alcohol, and was given marijuana by his brother when he was seven years old. After witnessing this abuse, Jones started acting out in his teens, resulting in his about three years in juvenile facilities. He tried to hang himself and was sent to a psychiatric hospital. Jones further recounted how he spent almost fifteen years in prison as an adult, an experience he described as "hell." *Jones*, 984 N.E.2d at 990. Jones also apologized to Yates's family, although later stated that he accidently killed Yates and denied "responsibility for . . . beating [Yates], raping her and aggravated murder." *Id.* at 990–91.

## C. Procedural History and Post-Conviction Proceedings

The jury recommended that Jones be sentenced to death the day after the mitigation hearing ended. The trial court accepted the jury's recommendation and sentenced Jones to death. On direct appeal, the Ohio Supreme Court affirmed Jones's conviction and death sentence. Jones then filed an application to reopen his direct appeal alleging ineffective assistance of counsel, which the Ohio Supreme Court summarily denied.

Jones filed a petition for post-conviction relief in the trial court while his direct appeal was pending. The trial court denied Jones's petition without an evidentiary hearing. On appeal, the Ohio Court of Appeals affirmed in part, including the trial court's denial of Jones's claims that he received ineffective assistance of counsel during the guilt phase. It reversed and remanded, however, for the trial court to hold a hearing on Jones's claim that his counsel had been ineffective during the penalty phase.

At the evidentiary hearing, Jones called 12 witnesses, including five experts. Jones did not testify. Jones introduced affidavits and witness testimony to show that two of Jones's brothers performed oral sex on him and forced him to perform it on them, starting as early as when he was seven years old. Additionally, witnesses testified to the larger atmosphere of sex abuse within Jones's family, including that Jones's father, cousin, and multiple siblings had sexually abused or attempted to sexually abuse several of his family members.

Jones's witnesses also testified that his trial counsel failed to uncover additional evidence of Jones's family dysfunction. Jones's sister, Yolanda, stated that Jones was not "shown love and affection as a child," that Henrietta would tell him that "she wished she would have aborted" him, and that Henrietta called them derogatory names, such as "you stupid bitches." DE 19-2, Evid. Hr. Tr., Page ID 7834–35. Another sister, Rhonda, noted that Henrietta "beat[] or whipped" her about four to five days a week, and Jones received similar physical and mental abuse. *Id.* at 7737. Other witnesses recounted similar stories about Jones's parents' serious drug and alcohol problems, which resulted in their neglecting Jones and his siblings.

Jones further highlighted that his mitigation investigator, Hrdy, was appointed on December 5, two days after trial began. During the month or so between being appointed and the mitigation hearing, Hrdy spent a total of 38 hours investigating, with approximately five hours interviewing Jones and ten additional hours with others, including family members and ministers. Jones also noted that Hrdy met with his family members for a limited amount of time, including during a four-and-a-half-hour group interview with many family members and friends at Henrietta's home. Dorian Hall, Jones's mitigation investigation expert, "opined that an investigator must begin at least 90 days before jury selection in order to conduct a proper investigation and was critical of [] Hrdy's acceptance of the engagement to do work on Jones's case after jury selection had already begun." *Jones*, 2019 WL 385467, at *11. She also criticized the amount of time Hrdy spent on the mitigation investigation, Hrdy's method of group interviewing, Hrdy's note keeping, and Jones's attorneys' portrayal of his father as a positive role model during the penalty phase. Yolanda and Coffe both, however, indicated that Hrdy had asked them generally about sex abuse, but neither told him anything. But Coffe explained that she felt her conversation with Hrdy was "too quick" and "rushed," and therefore did not think

she was "given the opportunity to explain correctly" Jones's and Jones's family's sexual abuse history.  DE 19-2, Evid. Hr. Tr., Page ID 7905–06.

Jones also proffered three experts—Bob Stinson, Jeffrey Madden, and Gary Beven—to challenge his attorneys' reliance on Siddall.  Stinson asserted that Siddall did not spend enough time—only 4.75 hours—reviewing Jones's medical records.  He testified that "absolutely no way you can get through [the records] in any meaningful way under five hours," let alone "under fifteen hours."  DE 19-2, Evid. Hr. Tr., Page ID 8048.  The experts also argued that Jones's illness was better categorized as schizoaffective disorder, bipolar type.  Stinson noted, however, that he and Siddall were "actually perhaps not as far off as it may seem" and would not "say[] [that Siddall] was wrong with the diagnosis of mood disorder."  *Id.* at 8036.  But he did argue that Siddall "didn't have enough information to give a complete picture" of Jones's mental illness.  *Id.*  The experts also challenged Siddall's concession during the penalty phase that Jones may have malingered some of his psychotic symptoms.  And Beven, Jones's primary treating psychiatrist in prison between 1995 and 2003, testified that it "would be a mischaracterization of eight years of intensive treatment" that Jones "consciously exaggerate[ed] his symptoms," and that he did "not believe that [] Jones was predominantly malingering during [his] eight years of treatment [with] him."  *Id.* at 7609, 7694, 7719.

All four members of Jones's mitigation team testified for the state at the evidentiary hearing.  Although Hrdy admitted that he was engaged to work on Jones's case "late in the game," he testified that he felt he had enough time to gather records, interview witnesses, and prepare for the mitigation hearing.  *Id.* at 8327, 8289–90.  And while he conceded there could be disadvantages to his group interview of Jones's family members, Hrdy noted that the family indicated they preferred to be interviewed as a group and that he thought the communal process was more dynamic and could help trigger memories to facilitate conversation.

Siddall also testified about his process, including his review of Jones's records, his interviews with Jones, and his coordination with the rest of the mitigation team.  Siddall stated that he was aware that Jones had previously received different diagnoses but felt it would have been inappropriate to rely on those diagnoses without doing his own testing.  And Siddall testified that, regardless of Jones's ultimate diagnosis, the most important thing to note about

Jones's condition was that "the core of [his] psychological problems included a depressive disorder, psychotic like features, and the history of antisocial behavior." *Id.* at 8377. Moreover, although Siddall noted that, "as a rule," he would generally get records and complete his mitigation report before trial began, he felt that he had enough time to complete his tasks and understood that he could have asked for more time if necessary. *Id.* at 8387–88, 8394–95.

Additionally, each member of the mitigation team stated that they asked either Jones or his family members about abuse. O'Brien, Hicks, and Siddall all stated that when they asked Jones whether he was molested or if his family had a history of sexual abuse, he always denied it. And both O'Brien and Hicks testified that none of Jones's family members indicated that Jones or any other members of his family had been sexually abused.

The trial court ultimately rejected each of Jones's claims and dismissed Jones's postconviction petition. It rejected Jones's claim that his attorneys were ineffective because they failed to discover the alleged sexual abuse and additional physical and emotional abuse in Jones's family. In doing so, it also found several of Jones's witnesses were not credible and concluded that much of the credible witness testimony was cumulative to that which was presented during the penalty phase. The court also rejected Jones's claim that his counsel were ineffective because they failed to discover the full extent of Jones's mental illness. The Ohio Court of Appeals affirmed, and the Ohio Supreme Court declined jurisdiction to hear the case.

Jones timely filed a federal habeas petition in June 2020, and then a first amended habeas petition in October 2021. Jones filed his second amended habeas petition in April 2022, which raised 11 claims. The district court denied Jones's petition in March 2024 but granted him a certificate of appealability ("COA") on five claims and subclaims. Jones moved to expand the COA, which we denied. Jones then timely appealed the district court's denial of his writ of habeas corpus.

## II.

Because Jones filed his petition in 2020, it is subject to the standards of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009). Under AEDPA, habeas relief is unavailable to "any claim that was adjudicated on

the merits" in a state court proceeding unless the state court's decision was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or "based on an unreasonable determination of the facts in light of the evidence presented" to the state court. 28 U.S.C. § 2254(d)(1)–(2). To determine whether the state court decided an issue on the merits, we look to "the opinion of the last state court to issue a reasoned opinion on the issue." *Moss v. Miniard*, 62 F.4th 1002, 1011 (6th Cir. 2023) (citation modified).

A state court decision is contrary to clearly established law where "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). "A state court decision unreasonably applies clearly established federal law if it 'correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case.'" *Davis v. Jenkins*, 115 F.4th 545, 553 (6th Cir. 2024) (en banc) (quoting *id.* at 407–08). We presume that the state court's factual findings are correct unless the petitioner rebuts them by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Stojetz v. Ishee*, 892 F.3d 175, 192 (6th Cir. 2018).

This standard is difficult to meet. *Davis*, 115 F.4th at 553. When a state court decided an issue on the merits, "[f]ederal habeas relief is available only if the state court's decision was objectively unreasonable." *Mammone v. Jenkins*, 49 F.4th 1026, 1041 (6th Cir. 2022). Thus, to overcome AEDPA deference, a petitioner must show that the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *White v. Woodall*, 572 U.S. 415, 419–20 (2014) (citation modified).

**III.**

Jones appeals three issues that the district court certified: (1) whether the trial court violated his Sixth Amendment right to confront witnesses against him when it admitted Delores's out-of-court statements through Jeffries's and Morrison's testimony; (2) whether trial

counsel were ineffective during the guilt phase for failing to employ a medical expert to challenge the state's expert on the issue of rape; and (3) whether trial counsel rendered ineffective assistance at the penalty phase for failing to: (a) hire a mitigation specialist until after voir dire began, (b) properly investigate mitigation evidence of sexual abuse and family dysfunction, (c) ask questions about specific mitigating factors during jury selection, and (d) properly investigate or retain experts to present evidence of Jones's serious mental illness at the penalty phase.  We discuss each issue in turn.

## A.

Jones first argues that the trial court violated his Sixth Amendment right to confront the witnesses against him.  Specifically, he alleges that the trial court unconstitutionally allowed Jeffries and Morrison to testify to out-of-court statements that Delores made to them regarding what Jones told her about Yates's death.  In 2012, the Ohio Supreme Court denied this claim on the merits.  The court first held that Jeffries's testimony about what Delores told her did not violate the Confrontation Clause because her statements were non-testimonial.  Second, it concluded that the admission of Morrison's testimony violated Jones's confrontation rights, but any such error was harmless.  Because the Ohio Supreme Court decided this claim on the merits, it is subject to AEDPA deference.  *Mammone*, 49 F.4th at 1041.  The district court rejected Jones's claim that the Ohio Supreme Court's findings were legally and factually unreasonable under 28 U.S.C. §§ 2254(d)(1) and (d)(2).  We agree.

## 1.

In all criminal prosecutions, the Confrontation Clause guarantees "the accused . . . the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless [they were] unavailable to testify, and the defendant had had a prior opportunity for cross-examination."  *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004).  This right is not implicated, however, by the admission of non-testimonial hearsay statements.  *See Whorton v. Bockting*, 549 U.S. 406, 420 (2007).  A statement is "testimonial" when its "primary purpose" is to "create[e] an out-of-court substitute for trial testimony."  *Michigan v. Bryant*, 562

U.S. 344, 358 (2011). Thus, a party's statements "to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Ohio v. Clark*, 576 U.S. 237, 249 (2015).[3]

At trial, Jones asserted his marital privilege to prevent Delores from testifying about their conversation about the circumstances leading to Yates's death. The court, however, allowed Jeffries to testify about her conversation with Delores under the excited utterance hearsay exception. Jeffries testified that Jeffries entered her home "upset" and "screaming" and immediately told her that Jones had confessed to murdering Yates. DE 19-1, Trial Tr., Page ID 5941–44. On cross-examination, Jeffries clarified that Delores said Jones had not described Yates's death as an accident.

The Ohio Supreme Court determined that Delores's statements to Jeffries were non-testimonial. It emphasized that "Delores was crying and hysterical when she told Jeffries that her husband had told her he killed the woman found in the cemetery." *Jones*, 984 N.E.2d at 977. The court also noted that Delores did not call police until after she spoke to Jeffries about Jones's statements. It therefore concluded that "[a]n objective witness would not reasonably believe that Delores's statements to her friend while in an emotional state, repeating what her husband had told her, would be available for later use at trial." *Id.*

We agree there is a reasonable argument that Delores's statements to Jeffries were nontestimonial and, thus, Jones's confrontation rights were not violated. Delores spoke to Jeffries in a panic after frantically entering Jeffries's home. While Delores conferred with Jeffries before she called police to report Jones, their conversation was not a "formal police interrogation intended to establish the facts of a crime committed well in the past" or "create a record for trial." *United States v. Lundy*, 83 F.4th 615, 620–21 (6th Cir. 2023) (quoting *Bryant*, 562 U.S. at 358). Instead, Jeffries appears to have been motivated by her friendship with Delores, which is a concern "entirely devoid of an underlying prosecutorial motive." *United*

---

[3]Although "AEDPA constrains the court to look to the law as clearly established at the time the state conviction became final," we "may rely on any later decisions analyzing or explaining the law (as opposed to creating new law)." *West v. Bell*, 550 F.3d 542, 552 n.3 (6th Cir. 2008) (internal citations omitted). Thus, to the extent we rely on cases that postdate the state court opinions adjudicating Jones's claims, we do so for that reason.

*States v. Ayoub*, 701 F. App'x 427, 438 (6th Cir. 2017).  What is more, Jeffries was neither associated with police nor present when Morrison interviewed Delores.  And "[s]tatements made to someone who is not principally charged with uncovering and prosecuting criminal behavior are significantly less likely to be testimonial than statements given to law enforcement officers." *Clark*, 576 U.S. at 249.  We therefore find that the Ohio Supreme Court reasonably concluded that Delores's statements to Jeffries were non-testimonial and that Jones's confrontation rights were not violated by the admission of Jeffries's statements.

**2.**

Jones and the government agree that Morrison's testimony about Delores's out-of-court statements violated Jones's confrontation rights.  The only question on appeal is whether the Ohio Supreme Court's conclusion that Morrison's introduction of Delores's statements was harmless beyond a reasonable doubt was reasonable under § 2254(d).

When a state court finds that a constitutional error at trial is harmless beyond a reasonable doubt, we apply the test from *Brecht v. Abrahamson*, 507 U.S. 619 (1993), as well as AEDPA's deferential standard of review.  *Brown v. Davenport*, 596 U.S. 118, 133–34 (2022).  Under *Brecht*, a state prisoner challenging his conviction must show that the error caused "actual prejudice," such that it had a "substantial and injurious effect or influence" on the outcome of his trial.  507 U.S. at 637–38 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  We then "apply the AEDPA standard to a state court's 'harmless beyond a reasonable doubt' assessment of constitutional errors pursuant to [*Chapman v. California*, 386 U.S. 18, 24 (1967)]." *Chandler v. Brown*, 137 F.4th 525, 547 (6th Cir. 2025).  We must therefore "deny relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA," and may only grant relief if we "find that the petitioner has cleared both tests." *See Davenport*, 596 U.S. at 134 (emphasis omitted).

On direct appeal, the Ohio Supreme Court concluded that Delores's statements to Morrison violated Jones's confrontation rights but were harmless beyond a reasonable doubt. The court emphasized that there was significant other evidence establishing Jones's guilt, including that Jones's DNA was found on vaginal swabs taken from Yates, that police

discovered a cross on Yates's face similar to one found in Jones's home, that Delores's properly admitted statements to Jeffries also implicated Jones, and that Jones had previously threatened, choked, and raped another woman under similar circumstances.  The court also noted that Jones testified himself that he knew Yates and had killed her accidently.  Finally, it emphasized that Sterbenz testified that Yates had been strangled for a long period of time, that Yates had extensive bruising on her face and neck, that Yates had vaginal injuries that may have been caused by a fist or large rigid foreign object, and that a twig was found four to six inches inside Yates's rectum.

Under *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), we consider whether a Confrontation Clause violation was harmless under several factors, "includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case."  For instance, "[w]e have found inadequately confronted testimony harmful when the State refers to it in opening and closing statements, and otherwise indicates its importance to the State's case; when the witness weighs in on a factual point that State and defense witnesses dispute; when it bolsters other witnesses' testimony; and when there is limited other evidence (and especially no physical evidence)."  *Miller v. Genovese*, 994 F.3d 734, 744 (6th Cir. 2021).  This inquiry is ultimately a holistic one.  *Id.*  Here, Jones cannot show that the Ohio Supreme Court's finding of harmless error was unreasonable under § 2254(d)(1) for several reasons.

First, there was significant other evidence (including physical evidence) connecting Jones to Yates's death.  The "overall strength of the prosecution's case" is the "most critical factor in [the] harmless error analysis."  *England v. Hart*, 970 F.3d 698, 715 (6th Cir. 2020).  For example, in *McCarley v. Kelly*, we emphasized that without the erroneously admitted statements, "the State's case would have been almost entirely circumstantial," "[t]he only physical evidence, the DNA gathered at the scene, was inconclusive," and "none of the testimony at trial," except for the wrongfully admitted testimony, "included a conclusive identification of" the defendant.  801 F.3d 652, 667 (6th Cir. 2015).  Thus, we compared the wrongly admitted testimony "to a

keystone holding the arch of the State's case together," which, when removed, caused the state's case to "collapse[] into disjointed pieces." *Id.* Here, in contrast, all—including Jones—agree that he killed Yates. And Morrison merely testified that Delores told him that Jones "killed" Yates and never opined on whether he did so intentionally. DE 19-1, Trial Tr., Page ID 5884, 5894–5918. Moreover, the state's case was supported by significant competent evidence, including Sterbenz's testimony, Delores's properly admitted testimony, and probative physical evidence. Morrison's testimony about Delores's unrebutted statements was hardly "the linchpin of the government's case, connecting the defendant to the fruits of the crime in a way no other evidence, testimonial or physical, could." *England*, 970 F.3d at 715–16 (citation modified).

Second, Morrison's testimony was cumulative of and corroborated by other evidence in the record. "Evidence that is merely cumulative of that already presented does not establish prejudice." *Id.* at 714 (citation modified). "The mere fact," however, "that one other witness . . . has testified to a particular fact . . . does not render other testimony on that point 'cumulative.'" *Vasquez v. Jones*, 496 F.3d 564, 576 (6th Cir. 2007) (quotation omitted). While "determining what constitutes cumulative evidence can be difficult," "our most frequent formulation of the standard is that new evidence is not cumulative if it differs both in strength and subject matter from the evidence actually presented at trial." *England*, 970 F.3d at 715 (citation modified).

At trial, Morrison stated that Delores told him that her "husband is the one that killed in the girl in the cemetery" and that Yates's name was "Susan." DE 19-1, Trial Tr., Page ID 5894–96. This testimony is unrebutted. Indeed, Jones admits that he killed Yates. And Morrison did not testify that Delores said Jones intentionally killed Yates. Morrison's testimony thus does not appear to differ in "strength and subject matter" from the other evidence presented at trial, *England*, 970 F.3d at 715 (quotation omitted), which differs from other cases where we found erroneously admitted testimony to be non-cumulative, *see, e.g.*, *Reiner v. Woods*, 955 F.3d 549, 559 (6th Cir. 2020) (finding evidence non-cumulative where the two pieces "evidence identified by the state [were] circumstantial" and "le[ft] inferential gaps in ways that the [the improper] statements d[id] not"). For the same reason, the third *Van Arsdall* factor—whether there is evidence corroborating or contradicting the witness's testimony on material points—also favors the state. *See id.* at 559–60 (noting that this element "largely overlaps" with the cumulativeness

question).  Both parties presented significant evidence corroborating Morrison's testimony about Delores's out-of-court statements, and Jones presented no evidence contradicting them.

Third, Morrison's improperly admitted testimony was not particularly important to the state's case.  As Jones admits, "[h]is identity as the person who caused Yates's death was undisputed."  CA6 R. 16, Appellant's Br., at 38.  And here, Morrison never explicitly stated that Delores said Jones intentionally killed Yates.  It is true that the state relied on Morrison's testimony in both its opening statement and closing argument to suggest that Jones murdered Yates, which could favor Jones on this point.  *See Reiner*, 955 F.3d at 557 ("A prosecutor's heavy reliance on testimony during closing argument evidences its importance in the case.").  But unlike other cases where we have found the offending testimony important, Morrisons's statements were accompanied by Jones's own admission and significant physical evidence, suggesting the statements had limited probative value.  *See Blackston v. Rapelje*, 780 F.3d 340, 360 (6th Cir. 2015) (offending testimony important where it "was the linchpin of the state's case"); *McCarley*, 801 F.3d at 666 (offending testimony important where it was referred to significantly in closing argument and "statements provided crucial narrative details and the only eyewitness identification of the perpetrator").

Because Jones admitting killing Yates and there was significant other evidence to support the verdict, Morrison's erroneously admitted testimony seemingly had little effect.  Thus, we do not have "grave doubt as to the effect or influence" Morrison's testimony "might have had on the jury's verdict."  *England*, 970 F.3d at 716.  For that same reason, Jones cannot overcome AEDPA's significant hurdles, which would require Jones to show that "*every* fairminded jurist would agree that [the] error was prejudicial."  *Davenport*, 596 U.S. at 136 (emphasis in original).[4]

---

[4]Jones also argues that the Ohio Supreme Court made unreasonable factual determinations under § 2254(d)(2) when it (1) considered Jones's admission that he killed Jones as relevant to the harmless error analysis and (2) relied on his prior rape conviction because it has little probative value.  "But the 'determinations' [Jones] takes issue with are not factual determinations as the Supreme Court has defined them but instead are complaints about the court's legal analysis."  *Hughbanks v. Hudson*, 2 F.4th 527, 543 n.1 (6th Cir. 2021) (citing *Thompson v. Keohane*, 516 U.S. 99, 109–10 (1995)).  We therefore reject Jones's argument under § 2254(d)(2).

**B.**

Jones next argues that his counsel provided ineffective assistance for failing to use an expert to rebut the state's finding of rape. Specifically, he contends that that the Ohio Court of Appeals' finding that he failed to show prejudice was contrary to clearly established federal law and an unreasonable application of federal law.

**1.**

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To prevail on a claim of ineffective assistance, a petitioner "must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense." *Mammone*, 49 F.4th at 1049.

We measure counsel's performance against "an objective standard of reasonableness" as defined by "prevailing professional norms." *Strickland*, 466 U.S. at 688. While Restatements and ABA Guidelines "can be useful as 'guides' to what reasonableness entails," they are useful "only to the extent they describe the professional norms prevailing when the representation took place." *Bobby v. Van Hook*, 558 U.S. 4, 7 (2009) (per curiam) (quoting *id.*). When considering an ineffective assistance claim, we "must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 689). And when AEDPA applies, we are "doubly" deferential to the state court's decision. *Id.* at 105. In such cases, "our task is *not* to determine whether trial counsel's performance was deficient." *Hodges v. Colson*, 727 F.3d 517, 536 (6th Cir. 2013) (emphasis in original). We ask instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

When assessing prejudice, we must "ask[] whether it is 'reasonably likely' the result would have been different." *Id.* at 111 (quoting *Strickland*, 466 U.S. at 696). "A reasonable probability means a 'substantial,' not just 'conceivable' likelihood of a different result." *Shinn v. Kayer*, 592 U.S. 111, 118 (2020) (per curiam) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 189

(2011)).  When analyzing prejudice for ineffective assistance claims, we consider "the totality of the evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding." *Towns v. Smith*, 395 F.3d 251, 257 (6th Cir. 2005) (citation modified).

A state court's decision is contrary to clearly established law if it "applies a rule that contradicts the governing law set forth in Supreme Court cases." *Lafler v. Cooper*, 566 U.S. 156, 173 (2012) (citation modified).  When that occurs, we are "unconstrained by § 2254(d)(1)" and can review the merits of the petitioner's claim de novo.  *Williams*, 529 U.S. at 406.  The Supreme Court has emphasized, however, that we must give state-court decisions "the benefit of the doubt" and that a "readiness to attribute error is inconsistent with the presumption that state courts know and follow the law."  *Johnson v. Genovese*, 924 F.3d 929, 935–36 (6th Cir. 2019) (citation modified).  Thus, a state court's "occasional imprecise or incorrect articulation of federal law does not run afoul of AEDPA if the state court otherwise properly discussed the governing law."  *Stefanski v. Douglas*, 2024 WL 1956213, at *6 (6th Cir. May 3, 2024); *see also Woodford v. Visciotti*, 537 U.S. 19, 23–24 (2002) (finding state court's "imprecise" recitation of prejudice prong not contrary to federal law where state court decision had otherwise "painstakingly describe[d] the *Strickland* standard"); *Genovese*, 924 F.3d at 934–38 (holding state court's decision was not contrary to federal law where it articulated *Strickland* standard correctly multiple times and articulated an incorrect prejudice standard—requiring clear and convincing evidence—only once).

## 2.

Jones argues that we should not apply AEDPA deference here because the Ohio Court of Appeals misapplied *Strickland*'s prejudice prong by incorrectly applying a higher burden of proof to his claim.  Jones focuses on a single sentence from the state court decision: "We conclude that [] Jones has failed to demonstrate that the outcome of his trial would have been different if [] Spitz had testified." *Jones*, 2011 WL 5869752, at *5.  We agree that this could be construed as requiring Jones to meet a higher burden than *Strickland* requires.  But "when a state court has already properly recited the *Strickland* standard, if at all possible, we should not read language later in its opinion to 'supplant[] *Strickland*' and thus 'needlessly create internal inconsistency in the opinion.'"  *White v. Plappert*, 131 F.4th 465, 483 (6th Cir. 2025) (quoting

*Holland v. Jackson*, 542 U.S. 649, 654 (2004) (per curiam)).  And, in the context of resolving this claim, the state court twice properly articulated *Strickland*'s prejudice prong before omitting the "reasonable probability" language.  Moreover, in reviewing the Ohio Court of Appeals decision as a whole, it appears to have correctly articulated the prejudice prong in two other instances and omitted the reasonable probability language in just this case.

Consistent with the Supreme Court's guidance that we give state courts decisions "the benefit of the doubt" and presume that "state courts know and follow the law," we find that the Ohio Court of Appeals did not misapply *Strickland*'s prejudice prong.  *See Holland*, 542 U.S. at 654–55 (quotation omitted).  Our conclusion follows several of our recent holdings where we found a state court's imprecise recitation of *Strickland*'s prejudice test was not contrary to clearly established Supreme Court law.  For example, in *White v. Plappert*, we concluded that the state court's application of *Strickland*'s prejudice prong was not contrary to Supreme Court law even where it concluded that there was no "possible or reasonable chance that the omitted testimony would have had such an *unquestionably* favorable impact that it would have changed the impact of the jury."  131 F.4th at 483 (emphasis added) (quotation omitted).  We reasoned that the "state court's usage of an 'imprecise' adverb" was not grounds to "upend[] its decision" where another possible interpretation was reasonable, the state court had already properly recited the *Strickland* standard, and taken as a whole, the opinion's incorrect phrasing "did not put its decision at odds with *Strickland*."  *Id.* at 483–84 (quotation omitted).

Moreover, in *Rogers v. Mays*, we concluded that a state court's decision was not contrary to clearly established Supreme Court law when it found the petitioner could not show prejudice because he "could not 'eliminate or completely discredit the State's'" evidence.  69 F.4th 381, 391–92 (6th Cir. 2023) (en banc) (quotation omitted).  We emphasized that "the state court's decision closely track[ed] the legal standard prescribed by the Supreme Court" and that the petitioner could not "'undermine confidence in the jury's sentence of death.'"  *Id.* at 392 (quoting *Pinholster*, 563 U.S. at 190).  Likewise, in this case, the state court repeatedly articulated *Strickland*'s prejudice prong correctly, including before the contested sentence and in other sections of the opinion.  We therefore decline to "'needlessly create internal inconsistency'

by charging the court with applying the incorrect test based on this stray reference." *Stefanski*, 2024 WL 1956213, at *6 (quoting *Holland*, 542 U.S. at 654).

Turning to the merits, the Ohio Court of Appeals rejected Jones's ineffective assistance claim because it found no prejudice.  It therefore did not reach the deficient performance question.  Because the state court addressed prejudice on the merits, we may only grant Jones relief under § 2254(d)(1) if the court unreasonably applied clearly established federal law. *Fitzpatrick v. Robinson*, 723 F.3d 624, 633 (6th Cir. 2013).

During state post-conviction proceedings, Jones introduced an affidavit from a forensic pathologist, Dr. Werner Spitz, to support his ineffective assistance claim.  Spitz concluded that, "to a reasonable degree of medical certainty," Jones did not rape Yates and that their sexual encounter was consensual.  DE 18-2, Spitz Aff., Page ID 1155–57.  Spitz argued that there was no evidence that Jones and Yates had anal intercourse, emphasizing that Yates had not suffered a rectal injury.  Additionally, he found the state's focus on the twig found in Jones's rectum was irrelevant and misleading.  This was because that the twig "caus[ed] no noticeable injury," which suggested that the twig entered Jones when her body "may have" been "dragg[ed] . . . on the ground."  *Id.* at 1156.  Spitz speculated that this could have occurred "during alleged resuscitative efforts," "at the time the blanket was pulled from under" Yates when she and Jones were having intercourse, or when Yates's "body was removed to the Medical Examiner's office."  *Id.*

Spitz also provided an alternative explanation for finding wadded paper in Yates's vagina, emphasizing that the autopsy found "no evidence of any trauma" to the vagina or "the external and internal genitalia."  *Id.*  He noted that he had "seen a number of times where women have used this technique as an effective means of contraception," using the tissue paper "as a 'plug' to obstruct entry of the sperm."  *Id.*  And he rejected the autopsy's finding that Yates was sexually assaulted, concluding instead that her soft tissue contusions "were due to the technique of organ removal." *Id.*  Spitz also noted that removing pelvic organs "entails considerable pulling and tugging."  *Id.* at 1157.  "In the absence of actual organ injury and damage to the overlying skin, including the perineum," he concluded "that the pelvic hemorrhage described in the autopsy report was" caused by the autopsy itself.  *Id.*

The state court rejected Jones's claim for lack of prejudice, noting that Spitz's affidavit failed to rebut several crucial aspects of the state's expert evidence. For instance, Spitz did not attempt to explain how the abrasions and contusions on Yates head were consistent with consensual sex. Spitz also failed to mention the gouging and fingerprint-type injuries apparent on Yates's neck, which suggested that Yates clawed at her own neck to stop Jones from strangling her. The state court likewise noted that while it may have been possible for a small twig to have entered Yates when Jones moved her around when allegedly trying to revive her, "Spitz did not offer an adequate explanation for the fact that the medical examiner discovered the twig four to six inches inside of her rectum." *Jones*, 2011 WL 5869752, at *5. And finally, Spitz failed to explain why, if something was inserted so far in her rectum to cause internal bruising, he would expect "actual organ injury" or "damage to the overlying skin, including the perineum." *Id.*

We find that the state court's conclusion that Jones could not show prejudice was a reasonable application of federal law. Jones argues that an expert such as Spitz could have better challenged the coroner's opinion that he raped Yates. Expert testimony, he says, would allow a reasonable juror to agree with Spitz that Yates's injuries were caused by the autopsy procedures, not rape. But Spitz's testimony failed to rebut much of the evidence that Jones raped Yates, which weighs against prejudice. *Cf. Hale v. Cool*, 122 F.4th 637, 650 (6th Cir. 2024) (noting that "although we decide[d] [the] case on performance (rather than prejudice) grounds, the district court's prejudice-focused analysis of [the petitioner's] proffered expert report is nonetheless helpful" because the expert's "report fail[ed] to rebut much of the state's evidence"). Indeed, Spitz did not offer a contrary explanation for the contusions on Yates's head, the gouging and fingerprint injuries to Yates's neck, or why a twig was found four-to-six inches inside of Yates's rectum.

Thus, "[e]ven if a court could interpret the record" in Jones's favor, his "reading of the facts is not the only one." *Fry v. Shoop*, 124 F.4th 1019, 1024 (6th Cir. 2025). In our review, "we ask only whether a fair-minded jurist could agree with the state court's assessment of the record." *Id.* And here, even Jones's hand-picked expert, Spitz, could not rebut much of the physical evidence that the state presented against him. An objectively reasonable state court

could therefore find that, even if Jones's counsel had employed an expert to counter Sterbenz, there would not be a reasonable probability of a different outcome. In sum, this shows, at most, "'fairminded disagreement,' not a state-court decision gone awry." *Id.* (quoting *Harrington*, 562 U.S. at 103).

Jones further argues that he was prejudiced because the other evidence in the case supported his claim that he accidently killed Yates. Specifically, he notes that his hands were uninjured and that forensic testing established that his blood was not under Yates's fingernails, which suggests that Yates did not try to fight him off and that their encounter was consensual. But significant facts also favor the state: Jeffries's testimony, the prior rape conviction, the inconsistencies between Jones's and Delores's stories, and Sterbenz's largely unrebutted scientific evidence all point in the other direction. Thus, even if a defense expert could have cast some doubt on Sterbenz's testimony, "the circumstantial evidence against [Jones] could have allowed the jury to find beyond reasonable doubt that he [raped Yates]." *Jackson v. McQuiggin*, 553 F. App'x 575, 583 (6th Cir. 2014). And because Jones's claim fails on the prejudice prong, we do not consider deficient performance under de novo review. *See Neuhard v. United States*, 119 F.4th 1064, 1071 (6th Cir. 2024).

**C.**

Jones makes four arguments challenging his counsels' performance during the penalty phase of trial. First, Jones asserts that his trial counsel were ineffective because they waited until after *voir dire* began to appoint a mitigation specialist and thus failed to leave enough time to competently investigate Jones's background. Second, Jones argues that his counsel failed to conduct a reasonable investigation into his background before the mitigation hearing, resulting in their failing to discover evidence of his sexual abuse and the full extent of his family's dysfunction. Third, Jones argues that his counsel could not have conducted an effective *voir dire* because his mitigation specialist was appointed too late and therefore his attorneys could not develop an adequate mitigation theme. Fourth, Jones asserts that his counsel failed to properly investigate or retain experts to present evidence of his severe mental illness during the penalty phase. Because Jones's first and second arguments involve similar issues regarding his counsels'

investigation into his mitigating circumstances, we consider them together. We address the remaining arguments in turn.

**1.**

Jones argues that his trial counsel failed to conduct a reasonable investigation for the penalty phase of trial, which resulted in their failing to discover significant evidence of sexual abuse in his family and childhood trauma. Jones also argues that his trial counsel were ineffective because they waited to have a mitigation specialist appointed until after *voir dire* began, which meant there was not enough time to do a competent investigation. The Ohio Court of Appeals rejected this claim on the merits, holding that Jones failed to show deficient performance. Finding that Jones's attorneys were not deficient, the court did not address whether Jones was prejudiced. Jones challenges this conclusion as an unreasonable application of law. Because the state court adjudicated the performance question on the merits, we apply AEDPA deference to its holding. *Fitzpatrick*, 723 F.3d at 639. This means that we must affirm the state court's decision if "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

Jones asserts that his trial counsel were ineffective because they failed to discover details regarding "the rampant sex abuse suffered by Jones as a youth" and his family's "history of severe and pervasive dysfunction." CA6 R. 16, Appellant's Br., at 48. Jones introduced evidence during his state post-conviction hearing that suggests he suffered from an unimaginably traumatic childhood. Jones presented testimony and affidavits indicating that, from as early as seven years old, his own brothers molested him; his father molested one daughter and tried to molest two others; one brother sexually assaulted Jones's niece; another brother raped and impregnated his then-girlfriend; and that he witnessed one of his brothers anally rape another brother, only after failing to molest Jones first. Moreover, Jones presented evidence that his attorneys' investigation failed to uncover the full extent of his family's dysfunction. This includes evidence that Jones was neglected from birth, in part because his parents and siblings

suffered from serious drug and alcohol problems; that Jones was neglected and subjected to physical and emotional abuse; and that he and his siblings had to steal in order to eat.[5]

We must conclude, nonetheless, that the Ohio Court of Appeals' conclusion that Jones's attorneys were not deficient was not an unreasonable application of law. Counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. A petitioner can show that his trial counsel were ineffective because they "fail[ed] to conduct an adequate investigation of a defendant's family background and mental health history." *Hill v. Mitchell*, 842 F.3d 910, 939 (6th Cir. 2016). But "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003). Crucially, under AEDPA review, our precedent "distinguishe[s] between counsel's *complete* failure to conduct a mitigation investigation, where we are likely to find deficient performance, and counsel's failure to conduct an *adequate* investigation, where the presumption of reasonable performance is more difficult to overcome." *Mitchell*, 842 F.3d at 939 (quotation omitted) (alteration in original). Under this highly deferential standard, "the state court ha[s] wide 'latitude'" to hold that a petitioner's "lawyers performed competently." *DeBruyn v. Douglas*, 168 F.4th 913, 925 (6th Cir. 2026) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

A fair-minded jurist could conclude that Jones's trial attorneys performed a competent investigation during the mitigation phase of Jones's trial. Indeed, "[t]he trial court found that the credible testimony in this case showed that all four members of the mitigation team asked about sexual abuse and that they were all met with denials." *Jones*, 2019 WL 385467, at *13. Hicks met with Jones approximately "fifty or sixty times" during the representation. DE 19-2, Evid. Hr. Tr., Page ID 8416–17. O'Brien met with Jones consistently as well, approximately once a week for the almost seven months that he represented him. Both Hicks and O'Brien asked Jones

---

[5]The trial court found several of Jones's witnesses—including some who testified about Jones's own sexual abuse and sexual abuse in Jones's family—to be uncredible. The Ohio Court of Appeals affirmed these findings on appeal. But evidence of Jones's family's history of sexual abuse was also introduced through other witnesses that the trial court found credible, including Coffe, two pastors, Jones's niece, and several of Jones's experts. We therefore assume that this evidence is properly before us, but still, for the reasons discussed, reject Jones's ineffective assistance claim on the merits.

whether he was sexually abused, which he consistently denied.  Siddall, Jones's expert in forensic psychiatry, likewise asked Jones about whether he was sexually abused or whether there was sexual abuse in his family, which he similarly denied.  And Hrdy, Jones's mitigation investigator, asked numerous members of Jones's friends and family, including Jones's mom, two of his sisters, the mother of Jones's children, and two of Jones's children, about whether Jones had suffered any abuse.  None indicated that Jones had suffered anything more than physical abuse.  And both Henrietta and Coffe admitted that Hrdy asked them about whether there was any family history of sexual abuse but neither shared any information with him.

Hicks and O'Brien also communicated often with members of Jones's family while developing Jones's mitigation case.  Hicks indicated that he spoke to Yolanda, Jones's sister, "probably a couple dozen times," including "eight or ten, maybe a dozen times" in person.  *Id.* at 8422–23.  Hicks also dealt extensively with Jones's mother, Henrietta.  Moreover, Hicks, O'Brien, and Hrdy met two or three times with members of Jones's family at O'Brien's office. Hicks explained that "[t]here were times when there were probably six or eight family members and friends who would come and . . . we would learn information from each of them."  *Id.* at 8429.  And O'Brien testified that he asked the family about whether "there [was] any physical abuse," "emotional or mental retardation," "sex abuse," or if any relatives had "molested" Jones. *Id.* at 8467–68.  Coffe confirmed this, noting that the family discussed the issue of "sexual abuse in the family" after one of their meetings.  *Id.* at 7917.  But in all these circumstances, neither Jones nor his family or friends disclosed any of this information to the mitigation team.

Moreover, Jones's attorneys and Hrdy obtained Jones's available school, correctional, and medical records.  Siddall reviewed those records and met with Hrdy to learn about Jones's history as developed from family interviews.  O'Brien testified that he reviewed all these records as well.  Siddall likewise interviewed Jones twice for seven hours total.  Siddall used those records and his interviews to diagnose Jones and testified at length during the penalty phase about Jones's background, mental illness, suicide attempts, and mental state.  And Jones has not identified which of Jones's records his counsel should have reviewed to learn about his or his family's history of sexual abuse or the full extent of their dysfunction.

Thus, we find Jones's case analogous to those circumstances considered by the Supreme Court in *Van Hook*. There, the Supreme Court rejected the petitioner's claim—under de novo review—that counsel's mitigation investigation was ineffective. 558 U.S. at 11–12. During the penalty phase, the petitioner's attorneys presented evidence of his traumatic childhood, substance abuse, and personality disorder. *Id.* at 10–11. But the petitioner challenged his counsel's "fail[ure] to find more" from other family members and a psychiatrist, "all of whom 'could have helped his counsel narrate the true story of [the petitioner's] childhood experiences.'" *Id.* at 11. The Supreme Court rejected the petitioner's claim, reasoning that his lawyers had already found evidence "from those closest to [the petitioner's] upbringing and the experts who reviewed his history" and therefore "it was not unreasonable for his counsel not to identify and interview" every other potential source of information. *Id.* Same here: "It was reasonable for [Jones's] lawyer[s] to assume that those closest to" him—his immediate family and clergy member friends—"would have the most detailed information about [his] life[] and would provide the most compelling testimony as a result." *Caudill v. Conover*, 881 F.3d 454, 462 (6th Cir. 2018).

This is also "not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face or would have been apparent from documents any reasonable attorney would have obtained." *Van Hook*, 558 U.S. at 11 (citations omitted). As Jones admits, "evidence of [his] sexual abuse was not contained in easy-to-access records." CA6 R. 22, Reply Br., at 13. This case is therefore analogous to *Strickland* itself, in which "defense counsel's 'decision not to seek more' mitigating evidence from the defendant's background 'than was already in hand' fell "well within the range of professionally reasonable judgments.'" *Van Hook*, 558 U.S. at 11–12 (quoting *Strickland*, 466 U.S. at 699).

Jones's arguments to the contrary are unpersuasive. He first argues that counsel failed to develop a relationship of trust with Jones's family and friends. Jones maintains that "it is paramount for [an] investigator to become familiar with the witnesses so that they feel comfortable enough to disclose uncomfortable truths." CA6 R. 16, Appellant's Br., at 49. While that may reflect an ideal attorney-client relationship, Jones cites no caselaw indicating that the Sixth Amendment right to counsel requires an attorney to develop "trust" with a criminal defendant and his family. Indeed, the Supreme Court has held that the Sixth Amendment right to

counsel does not guarantee a criminal defendant a "meaningful attorney-client relationship." *Morris v. Slappy*, 461 U.S. 1, 14 (1983); *see also McGill v. Shinn*, 16 F.4th 666, 690 (9th Cir. 2021).

Jones next contends that his attorneys' mitigation investigation was necessarily deficient because Hrdy was not appointed as mitigation specialist until after *voir dire* began. But the Supreme Court has never held that hiring a mitigation specialist in a capital case is a requirement of effective assistance of counsel. *See Jells v. Mitchell*, 538 F.3d 478, 495 (6th Cir. 2008). We instead apply a "case-by-case approach to determining whether an attorney's performance was unconstitutionally deficient under *Strickland*." *Rompilla v. Beard*, 545 U.S. 374, 394 (2005) (O'Connor, J., concurring). We merely consider whether an attorney's mitigation investigation reflects "reasonable professional judgment." *Strickland*, 466 U.S. at 690.

The record does not show that the timing of the mitigation investigation was objectively unreasonable. The grand jury supplemented the indictment against Jones to include a death penalty specification a little less than a month-and-a-half before trial. Two days later, Jones's attorneys requested funds to obtain Siddall; two weeks later, over two months before the penalty hearing began, they requested funds to retain a mitigation expert. True, as Hrdy himself admitted, he was "appointed rather late in the game." DE 19-2, Evid. Hr. Tr., Page ID 8327. But the record shows that Hrdy, O'Brien, and Hicks all interviewed numerous members of Jones's family and friends before the penalty phase hearing. While Hrdy may have only spent approximately ten hours interviewing Jones's family, Hrdy and O'Brien also specifically questioned Jones and his family and friends about his and the family's history of abuse. Siddall likewise produced a mitigation report and testified about Jones's low-range IQ and academic struggles, criminal history, history of depression, mood disorder, antisocial personality disorder, reported hallucinations, multiple suicide attempts, self-harm, and psychiatric treatments. And Jones, Henrietta, and Yolanda each testified about Jones's mental health problems, difficult childhood, and suicide attempts. The state court's conclusion that the timing of counsels' investigation did not make their performance deficient was therefore not objectively unreasonable. *See Mammone*, 49 F.4th at 1041.

The investigation was also not deficient merely because Hicks and O'Brien failed to "talk[] to seven other witnesses who could have confirmed the abuse in Jones's household." CA6 R. 16, Appellant's Br., at 53. When AEDPA deference applies, counsel's failure to "speak with each and every one of [a petitioner's] siblings and immediate family members" does not constitute deficient performance. *White*, 131 F.4th at 487; *see also Drummond v. Houk*, 797 F.3d 400, 405 (6th Cir. 2015). Here, Jones's counsel determined that they had enough information after speaking with Jones's mother, at least two of his siblings, the mother of his children, children, and clergyman, among others. From these sources, counsel obtained evidence about Jones's exposure to physical abuse, suicide attempts, mental illness, struggles in school, and substance abuse history.

Counsel, of course, "has a duty to conduct an independent investigation regarding mitigating evidence regardless of the defendant's reluctance to investigate and disclose such evidence." *Black v. Bell*, 664 F.3d 81, 104 (6th Cir. 2011). This means that "counsel cannot rely solely on information provided by the defendant and his family in determining the extent of a proper mitigation investigation." *Id.* But, as we have already noted, no "evidence of Jones's sexual abuse was contained in easy-to-access records." CA6 R. 22, Reply Br., at 13. After reviewing the records and talking to Jones and Jones's family and friends, counsel reasonably concluded that there was "no indication that these other family members were harboring 'potentially powerful mitigating evidence' that counsel should have known about." *White*, 131 F.4th at 487 (quoting *Van Hook*, 558 U.S. at 11). For this reason, it was not unreasonable for Jones's counsel "not to identify and interview" the seven other witnesses that Jones identifies. *Van Hook*, 558 U.S. at 11.

In sum, the state court's adjudication of the performance prong was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Because we reject Jones's deficient performance claim under AEDPA's deferential review, we do not address prejudice under de novo review. *Hodges*, 727 F.3d at 545.

**2.**

Jones next argues that his trial counsel were ineffective because they did not complete their mitigation investigation before jury selection began, which means that they could not conduct a meaningful *voir dire*. The state court held on the merits that Jones's attorneys were not ineffective because their decision not to ask specific questions about Jones's mitigating factors "may have been a tactical decision" that was consistent with Jones's sole defense at trial that he accidentally killed Yates. *Jones*, 2019 WL 385467, at *6. Because it rejected Jones's claim on performance grounds, the state court did not address whether he was prejudiced. The district court concluded that the state court's decision was not unreasonable.

We afford trial counsel's *voir dire* strategy significant deference. *Haight v. Jordan*, 59 F.4th 817, 833 (6th Cir. 2023) (per curiam). Indeed, "[a]n attorney's actions during voir dire are considered to be matters of trial strategy" and "cannot be the basis for a claim of ineffective assistance unless counsel's decision is shown to be so ill-chosen that it permeates the entire trial with obvious unfairness." *Hughes v. United States*, 258 F.3d 453, 457 (6th Cir. 2001). To overcome the presumption that trial counsel's *voir dire* performance was based on "sound trial strategy," Jones must show that "[t]he trial strategy itself" was "objectively unreasonable." *Miller v. Francis*, 269 F.3d 609, 616 (6th Cir. 2001).

Jones cannot overcome this significant hurdle. The state court reasonably found that Jones's counsel may have limited questions to jurors about mitigating factors because Jones's sole defense at trial was that he accidently killed Yates. Jones consistently represented to his attorneys and testified at trial that he accidently killed Yates during rough sex. Defense counsel reiterated this theory during trial. Read in context, Jones's counsel "appear[s] to have been pursuing a consistent and reasonable strategy" that did not "permeate the entire trial with obvious unfairness." *Keith v. Mitchell*, 455 F.3d 662, 676 (6th Cir. 2006) (citation modified). What is more, counsel *did* ask potential jurors their general views about mitigation and the death penalty at *voir dire*. Moreover, "neither of Jones's defense counsel testified regarding the defense's strategy during jury selection nor were they asked any questions regarding that strategy on direct or cross-examination" at the post-conviction evidentiary hearing. *Jones*, 2019 WL 385467, at *6. Jones ultimately has the burden to rebut the presumption that his attorneys' performance

amounted to objectively unreasonable trial strategy. *Stojetz*, 892 F.3d at 194. And "where a defendant presents no evidence to counteract this presumption and the record is silent as to the rationale behind his counsel's performance, an ineffective-assistance-of-counsel claim must be rejected under *Strickland*'s performance requirement." *Id.* at 195 (citation modified).

Nor were Jones's attorneys required to request a continuance because they had conducted a limited mitigation investigation before *voir dire*. It is true that "counsel's failure to make a reasonable investigation of a defendant's psychiatric history and family background, and to present mitigating evidence to the jury at sentencing, can constitute ineffective assistance." *Clark v. Mitchell*, 425 F.3d 270, 284 (6th Cir. 2005). But the state court found that Jones's counsel "had information about Jones's background, education, family history and mental health through competency evaluations[,] interviews[,] and records" before jury selection began. *Jones*, 2019 WL 385467, at *6. And "Jones's counsel testified at the post-conviction hearing that they had incorporated information regarding Jones's family history, background, and mental health issues into the defense at both the trial and the mitigation phase[s]." *Id.* Jones has not challenged these factual determinations on appeal. Jones therefore cannot overcome AEDPA's doubly deferential standard to show that his counsel were deficient for failing to request a continuance. *See Jells*, 538 F.3d at 496–97.

Even if we were to find Jones's attorneys' *voir dire* performance objectively unreasonable, we would still reject Jones's claim for lack of prejudice under de novo review. To establish prejudice, Jones must show "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different,' where a reasonable probability 'is a probability sufficient to undermine confidence in the outcome.'" *Keith*, 455 F.3d at 677 (quoting *Strickland*, 466 U.S. at 694). We have previously given deference to counsel's performance where "trial counsel[] fail[ed] to ask specific questions" during jury selection. *Id.* For example, in *Stanford v. Parker*, we found counsel's failure to ask jurors life-qualifying questions did not cause prejudice when "there [was] no evidence that any potential jurors were inclined to always sentence a capital defendant to death" and "nothing in the record indicate[d] that counsel's failure to ask [such] questions led to the impanelment of a partial jury." 266 F.3d 442, 455 (6th Cir. 2001). Similarly, here, Jones does not say which

prospective jurors he would have struck or which ones he would have tried to retain. Nor does he "dispute that he was convicted and sentenced by an impartial jury, and he presents no reason to think that a jury composed of a slightly different set of impartial jurors would have reached a different verdict or sentence." *Keith*, 455 F.3d at 678. We therefore reject Jones's claim that his counsel were ineffective because they did not conduct a meaningful *voir dire*.

**3.**

We finally address Jones's claim that his attorneys were ineffective because they failed to properly investigate and present expert testimony during the penalty phase. Jones specifically argues that his counsel were deficient because they failed to present testimony that he suffers from schizoaffective disorder, bipolar type, and that they did not properly rebut the state's allegations of malingering.

**i.**

The Ohio Court of Appeals rejected this claim on the merits, concluding that Jones's state post-conviction expert testimony was cumulative to evidence presented by Siddall during the penalty phase. Thus, without deciding whether counsel were deficient, the court rejected Jones's claim because he failed to show prejudice. AEDPA therefore applies to the state court's conclusion. *Rayner v. Mills*, 685 F.3d 631, 638 (6th Cir. 2012). Seeking to overcome this deference, Jones argues this holding was an unreasonable determination of the facts and an unreasonable application of the law under § 2254(d). We disagree.

To demonstrate that a state court decision was based on an unreasonable determination of the facts, Jones must show that the underlying facts found "were not just debatable or incorrect but 'unreasonable—a substantially higher threshold' for obtaining relief.'" *DeBruyn*, 168 F.4th at 927 (quoting *Shoop v. Twyford*, 596 U.S. 811, 819 (2022)). We presume that a state court's factual findings are correct and may only be rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Under federal habeas review, we may not supersede a state court's factual determination just because "reasonable minds reviewing the record might disagree about the finding in question." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (citation modified). The Ohio Court of Appeals concluded that Siddall's testimony was "consistent with and cumulative of"

Stinson's and Beven's testimony.  *Jones*, 2019 WL 385467, at *17.  Jones specifically takes issue with the state court's conclusion that testimony was cumulative, at least in part, because it concluded that Jones's "mental illness is inextricably wrapped around his anti-social personality disorder." *Id.*

The state court of appeals' factual determination was not unreasonable.  At the penalty phase, Siddall testified that Jones's condition resulted from his "serious history of depression and mood instability," which was "associated with repeated suicidal behaviors," alcohol and cannabis abuse, and an antisocial personality disorder.  *Jones*, 984 N.E.2d at 987.  During post-conviction proceedings, Siddall acknowledged that, by only diagnosing Jones with antisocial personality disorder, he was aware that diagnosis differed from some of Jones's other treating doctors in the hospital and prison systems.  He nonetheless felt that the "important" thing to take away from his testimony was that Jones suffered from serious "psychological problems," which "included a depressive disorder, psychotic like features, and the history of antisocial behavior." DE 19-2, Evid. Hr. Tr., Page ID 8377.  Siddall testified that, in describing Jones's symptoms to the jury, he did not think the "label[]" was most important but rather the "symptoms" associated with his condition.  *Id.* at 8379.

Moreover, Stinson testified that his and Siddall's diagnoses were "actually perhaps not as far off as [they] may seem." *Id.* at 8036.  And he stated that Siddall was not "wrong with the diagnosis of a mood disorder" and that he had "no problem" with Siddall's diagnosis of "antisocial personality disorder." *Id.* at 8036–37.  Beven agreed that there is "an overlap" of symptoms between schizoaffective disorder and a mood disorder.  *Id.* at 7666.  Beven also explicitly noted that, while Jones was incarcerated, he and another doctor had disagreed about whether "Jones was primarily somebody that had antisocial personality disorder or traits, as opposed to [Beven's] opinion which was that [Jones] indeed [had] those traits as part of his character, but the predominant problem was that of his schizoaffective disorder." *Id.* at 7655. Given this testimony, the state court did not unreasonably interpret the evidence by adopting the government's view and concluding that Siddall's and Jones's post-conviction experts' testimony were cumulative and consistent with each other.

Jones argues that the state court erred in determining the facts because it adopted the state's view of the evidence.  For example, he notes that Stinson testified that schizoaffective disorder differs from a traditional mood disorder like antisocial personality disorder because "it is also a thought disorder[] [that] has a component of psychosis."  DE 19-2, Evid. Hr. Tr., Page ID 8010.  Thus, a schizoaffective diagnosis means that a person also suffers from symptoms like "delusional belief[s]" or "hear[ing] voices that are not really there."  *Id.*  Beven also disagreed that the differences between schizoaffective disorder and antisocial personality disorder were "just names" and felt they were instead "separate diagnoses that connote two very different things."  DE 19-2, Evid. Hr. Tr., Page ID 7657.  But Siddall testified during mitigation that "there was a consensus in the record" that Jones suffered from "psychotic symptoms," including "hallucinations" and "[h]earing voices."  DE 19-2, Mitig. Hr. Tr., Page ID 7006.  And he agreed that Jones's symptoms of "auditory hallucinations[] or hearing voices . . . indicat[ed] that [they] first manifested itself when he was a youngster."  *Id.* at 7024–25.  Thus, while we acknowledge "the conflicting expert evidence," the state court did not "make a clear and convincing factual error" by "choos[ing] to credit" the government's "permissible view of the evidence."  *Debruyn*, 168 F.4th at 927–28; *see also Hill v. Shoop*, 11 F.4th 373, 389 (6th Cir. 2021) (en banc) ("[F]aced with two reasonable interpretations of evidence, we cannot say that the state court's decision to go with one over the other was unreasonable.").

For similar reasons, the state court's conclusion that there was no prejudice because Siddall's testimony was cumulative to Stinson's and Beven's was not an unreasonable application of clearly established law.  To find prejudice based on counsels' performance at the penalty phase, a defendant must show "a reasonable probability that, absent counsel's errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."  *Thornell v. Jones*, 602 U.S. 154, 163 (2024) (citation modified).  To succeed, "the additional, unpresented evidence" must "'differ[] in a substantial way—in strength and subject matter—from the evidence actually presented.'"  *White*, 131 F.4th at 494 (quoting *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005) (alteration in original).

As surveyed above, the state court reasonably concluded that Jones's post-conviction expert testimony was consistent with and cumulative to Siddall's testimony during the penalty

phase.  Indeed, the jury had already heard from Siddall that Jones suffered from serious psychological problems, including a depressive disorder, psychotic-like features, and a history of antisocial personality disorder.  It is true that Beven, as Jones's treating physician for eight years, may have presented a more compelling rebuttal to the state's allegations of malingering.  But we cannot say that the new expert testimony "differs in a substantial way—in strength and subject matter—from the evidence actually presented."  *White*, 131 F.4th at 494 (citation modified).  We therefore hold that a fair-minded jurist could conclude that Jones was not prejudiced by his counsels' alleged failure to discover the extent of his mental illness.  *See Harrington*, 562 U.S. at 112.

**ii.**

Even if the Ohio Court of Appeals erred on prejudice, Jones's claim would still fail because he cannot show deficient performance under de novo review.  "Mere disagreement between experts does not serve as an appropriate basis upon which to grant habeas relief." *Hughbanks v. Hudson*, 2 F.4th 527, 545 (6th Cir. 2021) (citation modified); *see also Mammone*, 49 F.4th at 1052 ("[S]electing an expert is the classic example of a strategic choice made by counsel.").  Where a petitioner "presents 'no evidence that [an expert] was incompetent, or that [his] lawyers had any reason to question [the expert's] professional qualifications," a petitioner cannot show that counsel was deficient for relying on that diagnosis.  *Hughbanks*, 2 F.4th at 545 (quoting *Campbell v. Coyle*, 260 F.3d 531, 555 (6th Cir. 2001)).

Jones has not shown that Siddall was incompetent or professionally unqualified. Although Jones contends that Siddall's 4.75 hours spent reviewing the records rendered his diagnosis "inaccurate," CA6 R. 16, Appellant's Br., at 67, he does not argue that Jones's lawyers "had any reason to question" Siddall's competency or qualifications, *Hughbanks*, 2 F.4th at 545. No one disputes that Siddall was a qualified mitigation expert.  Indeed, he is a licensed clinical and forensic psychologist who has performed hundreds of evaluations on individuals in criminal and civil settings.  And he has been appointed as a mitigation expert in fifteen to twenty capital cases dating back to the 1980s.  Moreover, Siddall submitted his bill to O'Brien for his services *after* the mitigation hearing, which indicates that Jones's attorneys had no reason to question the exact amount of time Siddall spent reviewing the records.

At bottom, Jones's challenge to Siddall is that his diagnosis—that Jones suffered from antisocial personality disorder rather than schizoaffective disorder, bipolar type—was "inaccurate." CA6 R. 16, Appellant's Br., at 67. But mere "disagreement in diagnoses is not sufficient to render counsel[s'] performance deficient." *Hughbanks*, 2 F.4th at 545. Jones's counsel were therefore "entitled to rely on" Siddall's "opinions and conclusions" at the mitigation hearing. *Mammone*, 49 F.4th at 1052; *see also Lewis v. Alexander*, 11 F.3d 1349, 1353 (6th Cir. 1993).

Jones also argues that his attorneys were deficient because they failed to review Jones's prison records, which he says were necessary to rebut the state's allegations that Jones malingered his psychotic symptoms.[6] Jones analogizes his case to *Rompilla*, where the Supreme Court held that a petitioner's lawyers were deficient because they failed to review mitigating evidence in his criminal records even though they knew that the state "intended to seek the death penalty by proving [the petitioner] had a significant history of felony convictions indicating the use or threat of violence." 545 U.S. at 383, 390. Here, Jones says that his trial counsel were deficient because they were aware that the government would rely on the Oakwood Report—housed in the Department of Rehabilitations and Corrections records—to show Jones malingered his psychotic symptoms. He contends his attorneys would have found Beven's records if they had reviewed those same files, and that calling Beven as a mitigation witness was necessary to properly rebut the malingering charge.

We find *Rompilla* inapplicable here. *Rompilla* requires that counsel "make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." *Id.* at 377. While Jones argues his "[c]ounsel did not supply Siddall with all the important records," CA6 R. 22, Reply Br., at 12, the record does not show that Jones's counsel or Siddall failed to review the prison file containing the Oakwood Report. It is true that Siddall testified that some records came in "late" and that he generally receives records before a capital trial "as a rule." DE 19-2, Evid. Hr. Tr.,

---

[6]Jones more fully developed this specific argument during oral argument. There, the state argued that this claim was waived because it was not fairly presented in Jones's habeas petition and appellate briefing. We need not, however, decide whether the argument is waived because we reject it here on the merits.

Page ID 8394, 8402.  But Siddall testified that he received "[t]he comprehensive records," which "would have included everything from school records to medical records to psychiatric or correctional records."  *Id.* at 8364.  This included the Oakwood Report—part of the Ohio Department of Rehabilitations and Corrections records—which Siddall indicated he relied on in drafting his mitigation report.  And Siddall testified that he was "able to read and see the diagnoses that the other doctors had given" when he "reviewed all the records from the hospitals and the prison system."  *Id.* at 8375.  Moreover, O'Brien stated that he reviewed the records as well.

Jones's case is also distinguishable from *Rompilla* because the new evidence there created a completely different mitigation strategy than what was presented during the penalty phase.  545 U.S. at 390–91.  In *Rompilla*, the relevant file led to "a range of mitigation leads that no other source had opened up" and presented petitioner's background "very differently from anything defense counsel had seen or heard."  *Id.* at 390.  Here, in contrast, counsel was aware of and prepared to rebut the malingering charge.  Indeed, Siddall extensively argued that whether a person has malingered is often independent of whether that person suffers from psychological problems.  While Siddall concluded that the "consensus of professional opinion" "contained in [Jones's] records suggest[ed] that [his] psychotic symptoms were consciously exaggerated[,]" DE 19-2, Mitig. Hr. Tr., Page ID 7005–06, 7215, he testified numerous times that "malingering in itself does not negate some form of mental disorder," *id.* at 6996; *see also id.* at 7018 (testimony attempting to limit the government's malingering charge to "psychotic symptoms" and pointing out that there were no "discussions" in the record "of malingering around the other psychiatric issues that [Jones] experiences"); *id.* at 7024 (testimony that "malingering can co-exist along with legitimate mental health problems" and agreeing that "malingering itself doesn't necessarily negate those underlying mental illnesses"); *id.* at 7028 (testimony rebutting state's malingering charge and noting that malingering "does not necessarily negate the fact that [a person] has legitimate psychiatric problems").  *Rompilla* involved counsel's failure to find "a range of mitigation leads that no other source had opened up."  545 U.S. at 390.  Counsel's failure here to present additional mitigation evidence to combat Jones's alleged malingering, including their failure to call Beven as a witness, is clearly distinguishable.

## IV.

For the foregoing reasons, we affirm the district court's judgment and deny Jones's petition for writ of habeas corpus.